THOMAS MOORE, EXECUTOR OF RICHARD EELS, PLAINTIFF IN ERROR, *v.* THE PEOPLE OF THE STATE OF ILLINOIS.

A State, under its general and admitted power to define and punish offences against its own peace and policy, may repel from its borders an unacceptable population, whether paupers, criminals, fugitives, or liberated slaves; and, consequently, may punish her citizens and others who thwart this policy, by harboring, secreting, or in any way assisting such fugitives.

It is no objection to such legislation that the offender may be liable to punishment under the act of Congress for the same acts, when injurious to the owner of the fugitive slave.

The case of Prigg *v.* The Commonwealth of Pennsylvania, (16 Peters, 539,) presented the following questions, which were decided by the court:

1. That under and in virtue of the Constitution of the United States, the owner of a slave is clothed with entire authority in every State in the Union, to seize and recapture his slave, wherever he can do it without illegal violence or a breach of the peace.

2. That the government of the United States is clothed with appropriate authority and functions to enforce the delivery, on claim of the owner, and has properly exercised it in the act of Congress of 12th February, 1793.

3. That any State law or regulation which interrupts, impedes, limits, embarrasses, delays, or postpones the right of the owner to the immediate possession of the slave, and the immediate command of his service, is void.

This court has not decided that State legislation in aid of the claimant, and which does not directly nor indirectly delay, impede, or frustrate the master in the exercise of his right under the Constitution, or in pursuit of his remedy given by the act of Congress, is void.

This case was brought up from the Supreme Court of the State of Illinois, by a writ of error issued under the 25th section of the Judiciary Act.

The section of the law of Illinois, under which Eels was indicted in 1842, and the facts in the case are set forth in the opinion of the court, and need not be repeated. The court before which he was tried, fined him four hundred dollars, and the Supreme Court of Illinois affirmed the judgment. The case is reported in 4 Scammon's Rep. 498.

It was argued, in this court, by *Mr. Chase*, for the plaintiff in error, and a printed argument filed by Mr. Dixon on the same side; and by *Mr. Shields* for the defendant in error, who filed a printed argument prepared by Mr. McDougall, Attorney-General of Illinois.

The arguments urged by the counsel for the plaintiff in error, in order to show that the law of Illinois was void, were, —

1. That the act of Congress, passed in 1793, was constitutional; that the power of legislating upon the subject of fugitive slaves, ought to be vested in Congress; that the act had been declared to be constitutional by the following authorities: 16 Peters, 620 *et seq.*; 9 Johns, 67; 12 Wendell, 311; 2 Pick. 11; 5 Sergeant & Rawle, 62; 2 Wheeler's Crim. Cases, 594.

2. That the power was vested exclusively in Congress, and if there was an omission to legislate, silence was as demonstrative of its will as express legislation. 5 Wheat. 1, 21, 22; 16 Pet. 617 *et seq.*

3. That admitting the power to be concurrent, its exercise by Congress supersedes all State legislation. 1 Kent, 380, 391; 1 Story, Com. on Con. § 437 to 443; 12 Wend. 316, 325; 1 Pet. Con. Rep. 429; 4 Id. 414–5; 2 Wheel. Crim. Cas. 594; 5 Wheat. 21, 24, 36, 70, 75; 14 Wend. 532–6; 16 Pet. 617–8.

4. The act of Congress of 1793, and the law of Illinois, conflict with each other.

5. Two laws legislating over the same offence, cannot exist at the same time.

6. If so, the law of Illinois must give way

It was particularly pressed upon the court by Mr. Chase, that this court had decided, in the case of Prigg v. Pennsylvania, (16 Pet. 539,) that all State legislation upon the subject of fugi-

tive slaves, was void, whether professing to be in aid of the legislation of Congress, or independent of it, was void; and he claimed the benefit of that decision.

The counsel for the defendant in error, commented on the various positions above mentioned; and the following extract from the brief, shows the principal ground relied upon to vindicate the State law.

The case just cited, (Houston *v*. Moore, 5 Wheaton,) leads directly to the question, What is the particular power exercised by the State in the present instance; whence derived, and what the design and mode of its operation? And it may be as well here to remark, that it is not alone in the light of an act in aid of the legislation of Congress, that this law is to be considered. The question before this court is one of power—of power in the State to legislate in the particular manner. If the power exists in the State, no matter from whence derived, the validity of the law cannot be questioned.

It is now contended that the power in question belongs to the States in virtue of their original and unsurrendered sovereignty; in virtue of those great conservative powers which all governments must have, exercise, and maintain for their own protection and preservation; powers which, in the language of Mr. Madison, (Federalist, No. 45,) " extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State."

In the City of New York *v*. Miln, (11 Pet. 139,) the court say, " that a State has the same undeniable, and unlimited jurisdiction over all persons and things within its territorial limits as any foreign nation, when that jurisdiction is not surrendered or restrained by the Constitution of the United States," &c.

It has been before remarked, that slavery exists to a limited extent in the State of Illinois; nevertheless, it is the settled policy of the State to discourage the institution, as also a free negro population. By numerous acts of legislation, before and since the present constitution, it has been made penal to introduce negroes from other States, except upon severe conditions. Negroes have been and continue to be regarded as constituting a vagabond population; and to prevent their influx into the State, restrictive laws have been from time to time passed. In connection with this regulation is to be found the law in question, prohibiting persons within the State from harboring or secreting fugitive negro slaves. The question whether a State may not prohibit its citizens from harboring or protecting felons, fugitives from other countries, is the same with this. It is pos-

sible that some new State might become a country of refuge for .the accused and convicted outcasts of older and stronger governments; would that State be compelled to receive and welcome the moral pestilence? Certainly not; the right of self-preservation, necessary to all governments, would justify any act required to repel them from her borders.

It was upon this principle, as a sovereign power in the State, that this court sustained the law of New York, intended to prevent the influx of a pauper and vagabond population at the port of New York. City of New York v. Miln, (11 Pet. 142.) In which case the court say, " We think it as competent and as necessary for a State to provide precautionary measures against the moral pestilence of paupers and vagabonds, and possibly convicts, as it is to guard against the physical pestilence which may arise from unsound and infectious articles imported, or from a ship the crew of which may be laboring under an infectious disease."

It was in favor of this same power that the court, in Prigg v. Pennsylvania, (16 Pet. 625,) qualify the general terms of their opinion, — " To guard, however, against any possible misconstruction of our views, it is proper to state that we are by no means to be understood, in any manner whatsoever, to doubt or to interfere with the police power belonging to the States, in virtue of their general sovereignty," &c.

The State may arrest, restrain, and even remove from its borders, the fugitive slave, and so long as the rights of the owner are not interfered with, it is a constitutional exercise of power. If, then, the greater power exists, that over the person of the slave, for the purpose of police, certainly the lesser power, that over the citizen, preventing him from harboring, secreting, or protecting the slave, for like purposes of police, will not be denied.

It will be perceived that this view of the case settles the point made in the opposing argument, that the law of Illinois is a violation of the Federal and State Constitutions, which prohibit two punishments for one offence. A legal offence is the breach of a law. Eels, in harboring a fugitive slave, violated a law of this State, by interfering with its internal policy. He also violated a law of Congress, by interfering with the rights of the slave-owner secured by the Constitution. The one act constitutes two distinct offences against the several laws of distinct jurisdictions. Within the same jurisdiction one act frequently constitutes several offences, as in the familiar cases of assaults, libels, and other personal injuries, which are offences against the persons injured, and at the same time offences against the government; and the different offences may be separately tried,

-and separately punished. The constitutional provision is not, that no person shall be subject, for the same act, to be twice put in jeopardy of life or limb; but for the same offence, the same violation of law, no person's life or limb shall be twice put in jeopardy.

Mr. Justice GRIER delivered the opinion of the court.

The plaintiff in error was indicted and convicted under the criminal code of Illinois for " harboring and secreting a negro slave." The record was removed by writ of error to the Supreme Court of that State; and it was there contended, on behalf of the plaintiff in error, that the judgment and conviction should be reversed, because the statute of Illinois, upon which the indictment was founded, is void, by reason of its being in conflict with that article of the Constitution of the United States which declares " that no person held to labor or service in one State, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such labor may be due." And, also, because said statute is in conflict with the act of Congress on the same subject.

That this record presents a case of which this court has jurisdiction under the twenty-fifth section of the judiciary act, is not disputed.

The statute of Illinois, whose validity is called in question, is contained in the 149th section of the Criminal Code, and is as follows: " If any person shall harbor or secrete any negro, mulatto, or person of color, the same being a slave or servant owing service or labor to any other persons, whether they reside in this State or in any other State or territory, or district, within the limits and under the jurisdiction of the United States, or shall in any wise hinder or prevent the lawful owner or owners of such slaves or servants from retaking them, in a lawful manner, every such person so offending shall be deemed guilty of a misdemeanor, and fined not exceeding five hundred dollars, or imprisoned not exceeding six months."

The bill of indictment, framed under this statute, contains four counts. The first charges that " Richard Eels, a certain negro slave, owing service to one C. D., of the State of Missouri, did unlawfully secrete, contrary to the form of the statute," &c.

2. That he harbored the same.

4. For unlawfully secreting a negro owing labor in the State of Missouri to one C. D., which said negro had secretly fled from said State and from said C. D.

4. For unlawfully preventing C. D., the lawful owner of said

2*

slave, from retaking him in a lawful manner, by secreting the said negro, contrary to the form of the statute, &c.

In view of this section of the Criminal Code of Illinois, and this indictment founded on it, we are unable to discover any thing which conflicts with the provisions of the Constitution of the United States or the legislation of Congress on the subject of fugitives from labor. It does not interfere in any manner with the owner or claimant in the exercise of his right to arrest and recapture his slave. It neither interrupts, delays, or impedes the right of the master to immediate possession. It gives no immunity or protection to the fugitive against the claim of his master. It acts neither on the master nor his slave; on his right or his remedy. It prescribes a rule of conduct for the citizens of Illinois. It is but the exercise of the power which every State is admitted to possess, of defining offences and punishing offenders against its laws. The power to make municipal regulations for the restraint and punishment of crime, for the preservation of the health and morals of her citizens, and of the public peace, has never been surrendered by the States, or restrained by the Constitution of the United States. In the exercise of this power, which has been denominated the police power, a State has a right to make it a penal offence to introduce paupers, criminals, or fugitive slaves, within their borders, and punish those who thwart this policy by harboring, concealing, or secreting such persons. Some of the States, coterminous with those who tolerate slavery, have found it necessary to protect themselves against the influx either of liberated or fugitive slaves, and to repel from their soil a population likely to become burdensome and injurious, either as paupers or criminals.

Experience has shown, also, that the results of such conduct as that prohibited by the statute in question are not only to demoralize their citizens who live in daily and open disregard of the duties imposed upon them by the Constitution and laws, but to destroy the harmony and kind feelings which should exist between citizens of this Union, to create border feuds and bitter animosities, and to cause breaches of the peace, violent assaults, riots, and murder. No one can deny or doubt the right of a State to defend itself against evils of such magnitude, and punish those who perversely persist in conduct which promotes them.

As this statute does not impede the master in the exercise of his rights, so neither does it interfere to aid or assist him. If a State, in the exercise of its legitimate powers in promotion of its policy of excluding an unacceptable population, should thus indirectly benefit the master of a fugitive, no one has a right to

complain that it has, thus far at least, fulfilled a duty assumed or imposed by its compact as a member of the Union.

But though we are of opinion that such is the character, policy, and intention of the statute in question, and that for this reason alone the power of the State to make and enforce such a law cannot be doubted, yet we would not wish it to be inferred, by any implication from what we have said, that any legislation of a State to aid and assist the claimant, and which does not directly nor indirectly delay, impede, or frustrate the reclamation of a fugitive, or interfere with the claimant in the prosecution of his other remedies, is necessarily void. This question has not been before the court, and cannot be decided in anticipation of future cases.

It has been urged that this act is void, as it subjects the delinquent to a double punishment for a single offence. But we think that neither the fact assumed in this proposition, nor the inference from it, will be found to be correct. The offences for which the fourth section of the act of 12th February, 1793, subjects the delinquent to a fine of five hundred dollars, are different in many respects from those defined by the statute of Illinois. The act of Congress contemplates recapture and reclamation, and punishes those who interfere with the master in the exercise of this right — first, by obstructing or hindering the claimant in his endeavors to seize and arrest the fugitive; secondly, by rescuing the fugitive when arrested; and, thirdly, by harboring or concealing him after notice.

But the act of Illinois, having for its object the prevention of the immigration of such persons, punishes the harboring or secreting nego slaves, whether domestic or foreign, and without regard to the master's desire either to reclaim or abandon them. The fine imposed is not given to the master, as the party injured, but to the State, as a penalty for disobedience to its laws. And if the fine inflicted by the act of Congress had been made recoverable by indictment, the offence, as stated in any one of the counts of the bill before us, would not have supported such an indictment. Even the last count, which charges the plaintiff in error with "unlawfully preventing C. D., the lawful owner, from retaking the negro slave," as it does not allege notice, does not describe an offence punishable by the act of Congress.

But admitting that the plaintiff in error may be liable to an action under the act of Congress, for the same acts of harboring and preventing the owner from retaking his slave, it does not follow that he would be twice punished for the same offence. An offence, in its legal signification, means the transgression of a law. A man may be compelled to make reparation in da-

mages to the injured party, and be liable also to punishment for a breach of the public peace, in consequence of the same act; and may be said, in common parlance, to be twice punished for the same offence. Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offence or transgression of the laws of both. Thus, an assault upon the marshal of the United States, and hindering him in the execution of legal process, is a high offence against the United States, for which the perpetrator is liable to punishment; and the same act may be also a gross breach of the peace of the State, a riot, assault, or a murder, and subject the same person to a punishment, under the State laws, for a misdemeanor or felony. That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable. He could not plead the punishment by one in bar to a conviction by the other; consequently, this court has decided, in the case of Fox *v.* The State of Ohio, (5 How. 432,) that a State may punish the offence of uttering or passing false coin, as a cheat or fraud practised on its citizens; and, in the case of the United States *v.* Marigold, (9 How. 560,) that Congress, in the proper exercise of its authority, may punish the same act as an offence against the United States.

It has been urged, in the argument on behalf of the plaintiff in error, that an affirmance of the judgment in this case will conflict with the decision of this court in the case of Prigg *v.* The Commonwealth of Pennsylvania, 16 Pet. 540. This, we think, is a mistake.

The questions presented and decided in that case differed entirely from those which affect the present. Prigg, with full power and authority from the owner, had arrested a fugitive slave in Pennsylvania, and taken her to her master in Maryland. For this he was indicted and convicted under a statute of Pennsylvania, making it a felony to take and carry away any negro or mulatto for the purpose of detaining them as slaves.

The following questions were presented by the case and decided by the court: —

1. That, under and in virtue of the Constitution of the United States, the owner of a slave is clothed with entire authority, in every State in the Union, to seize and recapture his slave, wherever he can do it without illegal violence or a breach of the peace.

2. That the government is clothed with appropriate authority and functions to enforce the delivery, on claim of the owner, and has properly exercised it in the act of Congress of 12th February, 1793.

3. That any State law or regulation which interrupts, impedes, limits, embarrasses, delays, or postpones the right of the owner to the immediate possession of the slave, and the immediate command of his service, is void.

We have in this case assumed the correctness of these doctrines; and it will be found that the grounds on which this case is decided were fully recognized in that. "We entertain," say the court, (page 625,) "no doubt whatsoever, that the States, in virtue of their general police power, possess full jurisdiction to arrest and restrain runaway slaves, and remove them from their borders, and otherwise to secure themselves against their depredations and evil example, as they certainly may do in cases of idlers, vagabonds, and paupers. The rights of the owners of fugitive slaves are in no just sense interfered with or regulated by such a course; and, in many cases, the operations of the police power, although designed essentially for other purposes, — for the protection, safety, and peace of the State, — may essentially promote and aid the interests of the owners. But such regulations can never be permitted to interfere with or to obstruct the just rights of the owner to reclaim his slave, derived from the Constitution of the United States, or with the remedies prescribed by Congress to aid and enforce the same."

Upon these grounds, we are of opinion that the act of Illinois, upon which this indictment is founded, is constitutional, and therefore affirm the judgment.

Mr. Justice McLEAN.

In the case of Prigg v. The Commonwealth of Pennsylvania, the police power of the States was not denied, but admitted. This court held, in Fox v. The State of Ohio, (5 How. 410;) that a person might be punished under a law of the State for passing counterfeit coin, although the same offence was punishable under the act of Congress, and, consequently, that the conviction and punishment under the State law would be no bar to a prosecution under the law of Congress. In that case I dissented, and gave at large the grounds of my dissent.

As the case now before us involves the same principle as was ruled in that case, I again dissent for the reasons then given, and I deem it unnecessary now to repeat them.

It is contrary to the nature and genius of our government, to punish an individual twice for the same offence. Where the jurisdiction is clearly vested in the Federal Government, and

an adequate punishment has been provided by it for an offence, no State, it appears to me, can punish the same act. The assertion of such a power involves the right of a State to punish all offences punishable under the acts of Congress. This would practically disregard, if it did not destroy, this important branch of criminal justice, clearly vested in the Federal Government. The exercise of such a power by the States would, in effect, be a violation of the Constitution of the United States, and the Constitution of the respective States. They all provide against a second punishment for the same act. It is no satisfactory answer to this, to say that the States and Federal Government constitute different sovereignties, and, consequently, may each punish offenders under its own laws.

It is true, the criminal laws of the Federal and State Governments emanate from different sovereignties; but they operate upon the same people, and should have the same end in view. In this respect, the Federal Government, though sovereign within the limitation of its powers, may, in some sense, be considered as the agent of the States, to provide for the general welfare, by punishing offences under its own laws within its jurisdiction. It is believed that no government, regulated by laws, punishes twice criminally the same act. And I deeply regret that our government should be an exception to a great principle of action, sanctioned by humanity and justice.

It seems to me it would be as unsatisfactory to an individual as it would be illegal, to say to him that he must submit to a second punishment for the same act; because it is punishable as well under the State laws, as under the laws of the Federal Government. It is true he lives under the *ægis* of both laws; and though he might yield to the power, he would not be satisfied with the logic or justice of the argument.

### Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Illinois, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.