## WILLIAM JORDAN CLAYBROOKS *v.* STATE OF MARYLAND

[No. 1151, September Term, 1976.]

*Decided June 7, 1977.*

The cause was argued before GILBERT, C. J., and MORTON and LISS, JJ.

*Reginald W. Bours, III, Assigned Public Defender,* for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Nelson W. Rupp, Jr., Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

The Fifth Amendment to the Constitution of the United States provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." Prior to *Benton v. Maryland,* 395 U. S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969), it was generally taken to be true that the Fifth Amendment prohibition was limited to cases involving strictly federal jurisdiction. *Palko v. Connecticut,* 302 U. S. 319, 58 S. Ct. 149, 82 L. Ed. 288 (1937); *State v. Stanley,* 34 Md. App. 393, 367 A. 2d 27 (1977). *Benton,* however, made manifest that the double jeopardy provision of the Fifth Amendment is applicable to the several States through the Fourteenth Amendment. *State v. Stanley, supra.*

We pointed out in *Stanley* that long before the *Benton* decision was handed down by the Supreme Court in its retreat from *Palko,* the established common law of Maryland prohibited the putting of an accused in jeopardy, twice, for the same offense. *See Blondes v. State,* 273 Md. 435, 330 A. 2d 169 (1975); *Neal v. State,* 272 Md. 323, 322 A. 2d 887 (1974); *Cornish v. State,* 272 Md. 312, 322 A. 2d 880 (1974); *State v. Barger,* 242 Md. 616, 220 A. 2d 304 (1966); *State v. Adams,* 196 Md. 341, 76 A. 2d 575 (1950); *State v. Shields,* 49 Md. 301 (1878).

*Neal v. State,* 20 Md. App. 20, 314 A. 2d 710 (1974), endeavored to bring a halt to piecemeal appeals. We noted that in *Jones v. State,* 241 Md. 599, 217 A. 2d 367 (1966) and

*Harris v. State,* 194 Md. 288, 71 A. 2d 36 (1950), the Court of Appeals entertained an immediate appeal from a refusal by the trial court to dismiss indictments for lack of a speedy trial. We had followed that lead in *Stevenson v. State,* 4 Md. App. 1, 241 A. 2d 174 (1968), and in *Brown v. State,* 2 Md. App. 388, 234 A. 2d 788 (1967), in holding, "that an immediate appeal would lie, prior to trial on the merits, from the denial of a motion asserting a violation of the constitutional right not to be twice put in jeopardy." *Neal v. State, supra,* 20 Md. App. at 24, 314 A. 2d at 712.

This Court's opinion in *Neal* observed that there had been 18 reported cases involving double jeopardy accounting from the inception of the Court, January 1967 to the date of filing of *Neal,* February 11, 1974. Of those 18 cases, in only two, *Jones v. State,* 17 Md. App. 504, 302 A. 2d 638 (1973), and *State v. Campbell,* 7 Md. App. 538, 256 A. 2d 537 (1969) was an accused actually twice put in jeopardy. We concluded that the allowing of an immediate appeal, prior to trial on the merits, of a denial of a motion to dismiss on grounds of double jeopardy or denial of a speedy trial, causes, " '[P]roceedings in every criminal case, great or small, . . . [to be] stopped and delayed while the accused prosecutes an appeal . . . [adding] just so much to . . . [the already onerous caseload of this Court].' " *Neal v. State, supra,* 20 Md. App. at 28-29, 314 A. 2d at 715; *Lee v. State,* 161 Md. 430, 157 A. 723 (1931). Then Chief Judge Orth, writing for the Court, set out the policy we elected to follow. He said:

"We are of the opinion . . . that whether a speedy trial has been denied or whether an accused will be twice put in jeopardy, will usually turn on the facts and circumstances present in the particular case. This has been evident, certainly, in the cases which have come before us. Thus, the determination of the question by the lower court would seem to involve an application of judicial discretion . . . . We shall follow the rule of *Pearlman* [*v. State,* 226 Md. 67, 172 A. 2d 395 (1961)] and *Lee* except in those cases where the trial judge concludes that the

constitutional right exists and is applicable but nevertheless refuses to apply it. To the extent that this is a departure from our cases heretofore decided, we depart from them." 20 Md. App. at 29-30, 314 A. 2d at 715.

Our departure was shortlived. The Court of Appeals vacated our judgment in *Neal* and made clear that it did "not share the view that a determination that double jeopardy does or does not exist involves an exercise of discretion." The Court, through Judge Singley, went on to state, "To us, the defense of double jeopardy is a liminal constitutional issue, raised at the outset, before there is a trial." *Neal v. State, supra,* 272 Md. at 326, 322 A. 2d at 889.

Ten days after the decision of the Court of Appeals in *Neal* was handed down, we filed our opinion in *Taylor v. State,* 22 Md. App. 370, 323 A. 2d 648 (1974). *Taylor* dealt with the immediate appealability *vel non* of a denial of a motion to dismiss for lack of a speedy trial. In that case, we said:

"The express message of the Court of Appeals in *Neal* is unmistakable. A denial of a motion to dismiss an indictment on the ground of double jeopardy is appealable immediately." 22 Md. App. at 372, 323 A. 2d at 650.

We observed in *Taylor,* with respect to a motion to dismiss for lack of a speedy trial, that if the court does not rule on the motion to dismiss, made prior to trial, but defers the ruling, pursuant to Md. Rule 725 d,[1] until the trial on the

---

1. Effective July 1, 1977, Md. Rule 725 d ceases to be a viable rule. As of that date, a new rule, No. 736 is operable. Md. Rule 736 will provide:

RULE 736. MOTIONS BEFORE TRIAL.

a. *Mandatory Motions.*

A motion asserting one of the following matters shall be filed in conformity with this Rule. Any such matter not raised in accordance with this Rule is waived, unless the court, for good cause shown, orders otherwise:

1. A defect in the institution of the prosecution;
2. A defect in the charging document, other than its failure to

merits, "no appeal lies from the trial court's declination to

show jurisdiction in the court or to charge an offense which defenses can be noticed by the court at any time;

3. An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;

4. An unlawfully obtained admission, statement or confession;

5. A motion for joint or separate trial of defendants or offenses.

b. *Time for Filing Mandatory Motions.*

A motion filed pursuant to section a of this Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 723 (Appearance — Provision for or Waiver of Counsel), except when discovery is furnished on an issue which is the subject of the motion, then the motion may be filed within five days after the discovery is furnished.

c. *Other Motions.*

Any other defense, objection or request capable of determination before trial without trial of the general issue shall be raised by motion filed at any time before trial.

d. *Content of Motions.*

A motion filed pursuant to this Rule shall be in writing unless the court otherwise directs, shall state the gounds upon which it is made, and shall set forth the relief sought. A motion alleging an illegal source of information as the basis for probable cause must be supported by precise and specific factual averments.

e. *Determination.*

A motion filed pursuant to this Rule, except a motion to dismiss for failure to obtain a speedy trial, shall be determined before trial unless the court otherwise directs in motions involving subsection a 4 of this Rule. If factual issues are involved in determining the motion, the court shall state its findings on the record.

f. *Effect of Determination of Certain Motions.*

1. Defect in Prosecution or Charging Document.

If the court grants a motion based on a defect in the institution of the prosecution or in the charging document, it may order that the defendant be held in custody or that the conditions of pretrial release continue for a specified time pending the filing of a new charging document.

2. Suppression of Evidence.

If the court grants a motion to suppress evidence, the evidence shall be excluded and shall not be offered by the State at trial, except that suppressed evidence may be used in accordance with law for impeachment purposes. If the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court in the exercise of its discretion grants a hearing de novo on a renewal of the motion. A pretrial ruling denying the motion to suppress is reviewable on a motion for a new trial or on appeal of a conviction.

New Rule 736 seems to us to remove any lingering doubt but that with the exception of motions to dismiss for lack of a speedy trial, or pre-indictment delay, or in some situations involving admissions, statements or confessions, the trial judge *must* rule upon all pretrial mandatory motions before the commencement of trial on the merits.

rule prior to trial." 22 Md. App. at 374, 323 A. 2d at 651. *See also Brady v. State,* 36 Md. App. 283 (1977).

Our observation in *Taylor* seems to have been misinterpreted by the trial judge in the instant case. We did not imply, suggest, nor hint that Md. Rule 725 d was to be used as an artifice to circumvent the holding of the Court of Appeals in *Neal.* Indeed, Rule 725 d is not a vehicle to thwart *Neal* and thus effectively erode its clear mandate. By the mere deferring of a ruling on a motion to dismiss grounded on former jeopardy, the constitutional barrier, erected by our founding fathers, would be no barrier at all. Rather, it would be relegated to the status of a high sounding phrase, devoid of substance and "signifying nothing." [2]

The net result of what we have herein said is that the former jeopardy proviso of the Fifth Amendment is a bar to a second trial. *Neal* requires a ruling before trial when there is a motion to dismiss on the basis of former jeopardy.[3] A denial of the motion is an interlocutory order which is immediately appealable. Failure to rule on the motion before trial is error.

We believe such error ordinarily to be reversible. We say "ordinarily" because there is an exception. The exception arises when the motion is based on a claim that is patently frivolous. When that occurs, although there is error, it is not reversible, but harmless. To hold otherwise would permit any defendant, in any criminal cause, to move to dismiss on the grounds of double jeopardy, even though there is no basis, and when the motion is decided against him, to divest the trial court of jurisdiction by simply noting an appeal. Such a practice could be used to obtain a continuance, a severance of the case from that of another, and probably would cause an appellate logjam. The constitutional protection against double jeopardy should not be allowed to become a contrived *pro forma* dilatory plea.

The Fifth Amendment is to be used as a shield not a sword. The orderly administration of justice may not be

2. William Shakespeare, 1564-1616, *Macbeth,* Act V, scene v, line 17.
3. *See* n. 1, *supra.*

twisted, bent, and distorted at the whim of an accused whose only purpose in invoking a frivolous plea of former jeopardy is to delay the trial so as to achieve some strategic or tactical advantage.

We now turn our attention to the instant case. The record reveals that in Montgomery County, on May 30, 1975, at approximately 7 p.m., on that Friday evening, a black man approximately 20 years of age, later identified as Ralph Raney Cunningham,[4] entered the Suburbia Federal Savings and Loan Association (Suburbia). Cunningham spoke with teller Deborah Sullivan about automobile loans. While they were talking, a second black man, the appellant, Claybrooks, entered and stood by the door. Claybrooks announced that a robbery was taking place and pulled out a gun. Cunningham then followed Sullivan to the cash drawers and placed approximately $1,800 in a yellow trash bag. Claybrooks then suggested that he and the other perpetrator attempt their escape.

In the meantime, Thurman Castellow, a barber, who went into Suburbia but retreated upon seeing that a robbery was in progress, ran into the Glenmont Inn, located across the mall from the scene of the robbery. There he exclaimed that Suburbia was being robbed. James Parker, who was sitting at the bar, saw Cunningham flee from the Suburbia building. Parker followed Cunningham to an open field whereupon Cunningham said he merely wished to get away. Parker responded that escape would be impossible. Cunningham and Parker began to fight. During the struggle, Claybrooks approached Parker and hit him across the back with a gun barrel. While the fight was ongoing between Cunningham and Parker, Cunningham dropped the bag containing the money that was taken in the robbery. The currency was blown around in the street until it was recovered by Michael Collins, who was also in the Glenmont Inn when Castellow entered.

---

4. Cunningham is not a party to this appeal because he was slain while serving a sentence in the federal penitentiary at Marion, Illinois.

Collins testified that he saw Cunningham flee from Suburbia with a trash bag, but he was unable to identify Claybrooks inasmuch as a white teller's cap was worn by Claybrooks in such a way that his face was apparently not clearly visible. Collins recalled the fight between Cunningham and Parker and said that he heard Cunningham tell the other man, Claybrooks, to "waste" Parker.

While Collins was retrieving the scattered money, Claybrooks, still wearing the white cap, stopped a green Volkswagen owned by passenger Jacqueline Baucom but then being driven by her fiance, James Updike. Updike testified that he saw a gun as Claybrooks forced his way into the car. At that time, obviously having recovered from being struck across the back and knocked down, Parker ran to the Volkswagen, pulled Claybrooks away, and the two fought. Updike then noticed money all over the street.

Cunningham joined Claybrooks in the fight against Parker. Parker was again struck by the gun barrel, this time on the head. Cunningham and Claybrooks then attempted to make good their escape.

Collins observed and reported to the police that the two culprits were driving down Georgia Avenue in a yellow Volkswagen. The Volkswagen was owned by Eldridge Henderson. Henderson identified Claybrooks as the person who entered his car and ordered him either to turn over the keys or be "blown away." Apparently of the view that discretion is the better part of valor, Henderson surrendered the keys. Cunningham then entered the car, and he and Claybrooks careened down Georgia Avenue on the wrong side of the street. Police officers from Montgomery County apprehended Cunningham and Claybrooks when the stolen yellow Volkswagen finally came to a halt after jumping a curb.

At 7:40 p.m., the police returned to Suburbia and conducted lineups at which Sullivan and Irvin H. Goebel, who also worked at Suburbia, identified Cunningham and

said that Claybrooks resembled the second man involved in the robbery.

On August 7, 1975, the Grand Jury for Montgomery County handed up a twenty-eight count indictment against Claybrooks. A petit jury, presided over by Judge Joseph M. Mathias, found Claybrooks guilty of assault with intent to maim, two counts of robbery with a dangerous and deadly weapon, attempted armed robbery, the use of a handgun in the commission of a felony, and possession of a handgun. Judge Mathias sentenced Claybrooks to terms totalling twenty-eight (28) years. Of that total, however, fifteen (15) years were to be served concurrently with a twenty-three (23) year sentence imposed by the United States District Court for the District of Maryland (Harvey, J.), and the remaining thirteen (13) years were made to run consecutive to the federal sentence.

Claybrooks, in this Court, assails the judgments of the circuit court by leveling a legalistic cannonade against them. We shall discuss each of the pentad of issues posed to us in the order presented, adding such facts as may be necessary to a better understanding of the issue.

I.

"In Maryland, a trial court may not compel a defendant to stand trial by the mere artifice of 'deferring' its ruling on a pre-trial motion properly raising the issue of double jeopardy; appellant's trial under such circumstances was an absolute nullity."

Prior to trial, Claybrooks filed a motion to dismiss, assigning as reason therefore, that he had been tried and convicted in the federal court for, "the exact conduct which the State intends to prove in these proceedings." Claybrooks asserted that it was "arbitrary and capricious to permit State authorities to prosecute . . . [him] for a second time when, by custom, practice, and policy, [5] federal authorities

5. Along with the motion to dismiss, Claybrooks's attorney filed a copy of a Department of Justice news release dated April 6, 1959. In that writing,

would not prosecute ... [him if he were] convicted in State court before federal prosecution had been concluded."

Over strenuous objection, Judge Mathias relying upon Md. Rule 725 d, deferred his ruling upon the motion until after the verdicts. The deferral was, as we have seen, error, but under the circumstances of the particular facts of this case, we do not believe that it is reversible nor was the trial a nullity. For the reasons we shall set out in part II, *infra*, the ultimate ruling by Judge Mathias was correct. We think it would be fatuous rigmarole, poverty stricken of common sense, to reverse the judgments and remand this case for a new trial solely because the trial judge made a procedural error which, as it develops, did not affect the final result. The better practice, however, is that trial judges not defer rulings on motions to dismiss because of alleged double jeopardy in order to avoid the impact of *Neal*.[6] At the expense of repetition, the delay in the ruling constituted error, but in the case now before us that error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967).

## II.

"Appellant's prosecution ... subjected him to double jeopardy and deprived him of due process of

---

then Attorney General of the United States, William O. Rogers, quoted from a "Memorandum to the United States Attorneys." The memorandum read:

"In two decisions on March 30, 1959, the Supreme Court of the United States reaffirmed the existence of a power to prosecute a defendant under both federal and state law for the same act or acts. That power, which the Court held is inherent in our federal system, has been used sparingly by the Department of Justice in the past. The purpose of this memorandum is to insure that in the future we continue that policy. After a state prosecution there should be no federal trial for the same act or acts unless the reasons are compelling."

Apparently that policy was followed in the case of Arthur Herman Bremer, who was charged with assault with intent to murder Governor George C. Wallace of Alabama. After Maryland had tried and convicted Bremer for that and related offenses, the federal authorities proceeded no further with a prosecution against Bremer. Bremer v. State, 18 Md. App. 291, 307 A. 2d 503 (1973).

6. *See* n. 1 *supra*.

law in violation of the Fifth and Fourteenth Amendments to the United States Constitution and the common law of Maryland."

The Supreme Court in *Moore v. Illinois*, 55 U. S. (14 How.) 13, 14 L. Ed. 306 (1852) said:

"Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offense or transgression of the laws of both.

\* \* \*

That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offense; but only that by one act he has committed two offenses, for each of which he is justly punishable. He could not plead the punishment by one in bar to a conviction by the other." 55 U. S. at 20, 14 L. Ed. at 309.

The late Mr. Justice Frankfurter, writing for the majority of the Court in *Bartkus v. Illinois*, 359 U, S. 121, 79 S. Ct. 676, 3 L.Ed.2d 684 (1959), quoted with approval from *Moore v. Illinois, supra*. At the same time, Justice Frankfurter pointed out that in a dozen cases between *Moore* (1852) and *United States v. Lanza*, 260 U. S. 377, 43 S. Ct. 141, 67 L. Ed. 314 (1922), the Court had reaffirmed the principle that successive State and federal prosecutions do not violate the Fifth Amendment. 359 U. S. at 132, 79 S. Ct. at 682-83, 3 L.Ed.2d at 692.

Maryland has, in a number of cases, followed the view of the Court in *Moore*. *See e.g., State v. James*, 203 Md. 113, 100 A. 2d 12 (1953); *Worthington v. State*, 58 Md. 403 (1882); *Bloomer v. State*, 48 Md. 521 (1878); *Stathes v. State*, 29 Md. App. 474, 349 A. 2d 254 (1975), *cert. denied*, 277 Md. 741

(1976); *Bell v. State*, 22 Md. App. 496, 323 A. 2d 677, *cert. denied*, 272 Md. 737 (1974), *cert. denied*, 421 U. S. 1003, 95 S. Ct. 2405, 44 L.Ed.2d 672 (1975); *Melville v. State*, 10 Md. App. 118, 268 A. 2d 497, *cert. denied*, 259 Md. 729, 30, 32, 33, 34 (1970).[7]

In *Bell*, we considered and rejected the precise issue that Claybrooks raises in the case *sub judice*. *Bell* is dispositive of the matter.

Nevertheless, Claybrooks makes one final stab at urging us to hold that former jeopardy should have barred the trial in the circuit court. He asserts that the common law rule against double jeopardy operates as a bar to trial even if the Fifth Amendment does not. We have an entirely different view. The Fifth Amendment, as we see it, is but a constitutional proviso incorporating the common law rule that we followed prior to *Benton v. Maryland, supra.* *Benton*, through the Fourteenth Amendment, made the

---

7. The Attorney General, in his brief, also relies upon Rossberg v. State, 111 Md. 394, 74 A. 581 (1909). In that case, the Court held "that municipal authorities may be given concurrent power with the State to punish certain classes of offenses, and that which first obtains jurisdiction of the person of the accused may punish to the extent of its power; and, further, that the ordinance is not made invalid by the mere fact that the State law and the ordinance provide in terms for distinct prosecutions for the same act." 111 Md. at 415-16, 74 A. at 584. The Court did not decide the question of whether a conviction or acquittal of the State charge " 'could properly be pleaded to an indictment for the violation, by the same act, of a municipal ordinance.' " 111 Md. at 416, 74 A. at 584. The question was left open. Waller v. Florida, 397 U. S. 387, 90 S. Ct. 1184, 25 L.Ed.2d 435 (1970), however, clearly indicates that a State and its municipalities are not separate sovereign entities. Each may not impose punishment of a violation of its separate laws by one act.

Claybrooks reads *Waller* as eroding *Bartkus* and its ancestors. We do not. The relationship that exists between the State and its municipalities on the one hand and the federal government and the States on the other is vastly different. Municipalities derive their authority and such sovereignty as they may have from the State. They are creatures of the State and if the State confers no authority upon them, they have none. The federal government is limited to the power vested in it by the States through the ratification of the Constitution. By the Tenth Amendment, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Thus, the federal government also derives its power from the States. It has no more authority than the States have given it, but once that authority is given, and exercised, it becomes the supreme law of the land, and the States are not at liberty to ignore, undercut, or erode it.

Fifth Amendment's double jeopardy clause applicable to the States and brought about a substantial change in those States that had erected no barrier to double jeopardy. *See e.g., Palko v. Connecticut, supra. Benton's* effect on Maryland is minimal at best, and more illusory than real.

## III.

"The uninterrupted and totally inexcusable delay of eleven months from appellant's arrest until trial, combined with the State's conduct in bringing the prosecution, deprived appellant of a speedy trial, and otherwise constitutes an egregious violation of his right to due process of law."

Whether the delay between appellant's arrest on May 30, 1975 and his trial commencement of April 20, 1976 (a time lapse of ten months and twenty days), requires the *Barker v. Wingo*, 407 U. S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972), balancing is dependent on the underlying question of whether the delay is of constitutional proportions.

Claybrooks was apprehended on the date of the offense, May 30, 1975. The same day, he was turned over to the federal authorities. At that time, the only State charges placed against Claybrooks were six traffic violations. The Federal Grand Jury for the District of Maryland indicted Claybrooks on June 3, 1975,[8] and he was arraigned the next day. The Montgomery County indictment followed on August 7, 1975, two (2) months and four (4) days later. Although there is testimony that a bench warrant, issued on the strength of the indictment, was sent to the United States Marshal, no acknowledgment was ever received from the Marshal. Claybrooks denied knowledge of the indictment until he received a copy from his federal public defender in

---

8. The indictment charged that Claybrooks, et al, (1) "did unlawfully by intimidation take" from a Suburbia Federal Savings and Loan Association "money in the amount of $1858.56 on May 30, 1975"; (2) "did take and carry away, with intent to steal" from Suburbia, "money in the amount of $1858.56"; (3) "did assault and put in jeopardy the lives" of employees of Suburbia "by pointing a fire arm in their direction."

October 1975. It was "agreed" that Claybrooks "would testify that he was not aware of any detainers filed against him until his arraignment in the Circuit Court for Montgomery County on November 7, 1975." Claybrooks did, however, help Cunningham [9] to write a letter to the latter's attorney requesting a speedy trial. The letter was written subsequent to Claybrooks's arraignment in the circuit court.

During the ten month and twenty day period, Claybrooks was in the custody of the federal authorities for a period of two (2) months and eight (8) days prior to the State indictment, and three months after that indictment but prior to arraignment, a total of five (5) months and eight (8) days. When we subtract the federal custody period from the total delay, we are left with a maximum of five (5) months and twelve (12) days. In our view, that period does not reach constitutional dimension so as to require the balancing mandated by *Barker, supra.*

We think that even if the total delay of ten months and twenty days were properly chargeable to the State, under the peculiar circumstances surrounding the exercise of separate sovereign powers, by the federal government and the State, the delay does not cross the threshold of constitutional breadth.

We perceive no error in the trial judge's denial of Claybrooks's motion to dismiss for lack of a speedy trial.

### IV.

"Appellant was improperly charged and convicted under the twentieth count of the indictment."

The twentieth count of the indictment averred in pertinent part that appellant,

"On or about May 30, 1975, ... unlawfully did use a handgun, in the commission of a felony, in violation of Article 27, Section 36B of the Annotated Code of Maryland, contrary to the form of the Act of

---

9. *See* n. 4, *supra.*

> Assembly in such case made and provided, and against the peace, government and dignity of the State."

To understand the impact of Claybrooks's contention, an analysis, preliminarily, of the multi-count indictment is necessary.

Claybrooks was, as we have noted, indicted in a twenty-eight count charging document. We are concerned here with the first twenty counts. Counts 1 through 4 asseverated that Claybrooks had 1) assaulted with intent to murder James Bruce Parker (a felony, Md. Ann. Code art. 27, § 12); 2) assaulted with intent to maim Parker (a felony, Md. Ann. Code art. 27, § 386); 3) committed an assault and battery upon Parker (a common law misdemeanor); and 4) committed an assault on Parker (a common law misdemeanor). Count 5 asserted that Claybrooks had used a handgun in the commission of a felony and therefore had violated Md. Ann. Code art. 27, § 36B.

The sixth through eighth counts alleged, 6) the attempted felonious robbery, with the use of a dangerous and deadly weapon, of a 1968 Volkswagen Sedan from Jacqueline Jeanne Baucom (a felony, Md. Ann. Code art. 27, §§ 486-488); 7) an assault with intent to rob Ms. Baucom of her vehicle (a felony, Md. Ann. Code art. 27, § 12); and 8) an assault upon Ms. Baucom (a common law misdemeanor). Count 9 laid another handgun in the commission of a felony charge. The tenth through twelfth counts repeated the allegations of counts 6, 7, and 8 but stated that they were applicable to offenses committed against James Patrick Updike. The thirteenth count, again, charged a violation of the use of a handgun in the commission of a felony (Md. Ann. Code art. 27, § 36B). Counts 14 through 19 referred to offenses committed against Eldridge Monte Henderson. Count 14 stated that Claybrooks had robbed, "with a dangerous and deadly weapon," Henderson of a 1971 Volkswagen (a felony, Md. Ann. Code art. 27, §§ 486-488); count 15, the robbery of Henderson (a felony, Md. Ann. Code art. 27, § 486); count 16, assault with intent to rob

Henderson (a felony, Md. Ann. Code art. 27, § 12); count 17, assault upon Henderson (a common law misdemeanor); count 18, larceny of Henderson's 1971 Volkswagen "in violation of Article 27, Section 348" (a felony); count 19, the unauthorized use of Henderson's motor vehicle (a misdemeanor, Md. Ann. Code art. 27, § 349).

The 20th count repeated the handgun violation.

Claybrooks, as he is permitted to do by Md. Rule 715 a, filed a demand for a bill of particulars of counts 5, 9, 13, and 20. He requested that the State "specify in each instance the underlying felony during the commission of which the Defendant is alleged to have used a handgun as charged." The State opposed the particulars and Judge Frosh, who heard the motion and opposition thereto, agreed with the State.

We think it clear from a reading of the indictment that the fifth count referred to the felonies preceding it. The ninth count referred to the felonies charged in counts 6 and 7. The thirteenth count was concerned with the felonies in counts 10 and 11. The twentieth count was, at the time of hearing the motion, directed toward counts 14 and 15. Apparently because it foresaw some difficulty, immediately prior to trial, the State nol prossed the fifth, ninth, and thirteenth counts. The result was that the twentieth count then became the only viable handgun count, and it embraced the commission of all felonies charged in the indictment and proven at trial. Md. Rule 712.

Inasmuch as all the charges grew out of the incident of May 30, 1975, the appellant was fully apprised that he was charged with using a handgun during the commission of those offenses which were felonies.

Rule 712 a provides, "An allegation made in one count may be incorporated by reference in another count." *See* *Turner v. State*, 242 Md. 408, 219 A. 2d 39 (1966). Count 20, being sufficient on its face, no bill of particulars was necessary to clarify it. *Veney v. State*, 251 Md. 159, 246 A. 2d 608 (1968); *Avery v. State*, 15 Md. App. 520, 292 A. 2d 728, *cert. denied*, 266 Md. 733 (1972) *appeal dismissed*, 410 U. S.

977, 93 S. Ct. 1499, 36 L.Ed.2d 173 (1973). At the end of the evidence, the trial judge properly instructed the jury relative to the handgun violation when he advised it:

> "Count twenty charges a violation of that part of the handgun statute known as Section 36Bd, and that says, in effect, that the crime of using a handgun in the commission of a felony consists of using a handgun in the commission of *any* felony or *any* such crime of other violence. . . . [A]rmed robbery is a felony. . . ." (Emphasis supplied.)

### V.

> "Insufficient evidence, combined with error in the trial court's instructions require reversal of the judgments below."

Claybrooks's final argument is tetrahedral. Three of its faces, respectively, are concerned with the sufficiency of the evidence on the second count — assault with intent to maim James Bruce Parker, the sixth count — "attempted armed robbery" of Jacqueline Jeanne Baucom, and the fourteenth count — "armed robbery" of Eldridge Monte Henderson. The fourth face of the contention relates to jury instructions and is, itself, subdivided into three areas of complaint.

### i.

The second count, in pertinent part, charged that, ". . . William Jordan Claybrooks . . . on or about May 30, 1975 . . . unlawfully did make an assault upon . . . Parker, with intent to maim, disfigure and disable him. . . ."

The judge instructed the jury, with respect to the count, that:

> "The statute describing this offense says in pertinent part: If any person shall unlawfully shoot at another person or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person, or assault or beat any person, with intent to maim, disfigure, or

disable such person, he shall be guilty of this offense.

You can see, therefore, that intent is what distinguishes this crime from the offense charged in the first count of assault with intent to murder."

The language used by the trial judge is lifted largely from Md. Ann. Code art. 27, § 386. That section provides in essence that if a person, in an effort to avoid apprehension, "shall assault or beat any [other] person, with intent to maim, disfigure or disable such [other] person, or with intent to prevent the lawful apprehension or detainer [of the accused]" such accused shall be guilty of a felony.

We think it clear that the indictment failed to allege a pertinent part of the crime, namely, that element of assault while intending to escape or elude capture.

The evidence showed that Parker, upon learning that the Savings and Loan was being robbed, observed Cunningham leave the building, and he followed him. Parker attempted to capture Cunningham and a struggle ensued. After Cunningham yelled to Claybrooks to "burn him," Claybrooks pointed what was described as a sawed-off 410 gauge shotgun at Parker's head. No shot was fired, however, but Parker was struck across the upper back and knocked to the ground. The two felons then attempted to take the Baucom vehicle. Parker caught up with them and endeavored to pull them from the car. He was struck over the head by the gun barrel, and he sustained a slight wound.

The court's instruction, when viewed in the light of the facts, is incomplete. The pertinent intent, in this case, is not the intent "to maim, disfigure, or disable such person." Rather, the requisite intent is "to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained. . . ."

The indictment as drawn excluded from its purview the pertinent element, found in the evidence, of assault with intent to avoid arrest. The State's wording of the indictment narrowed the charge to one of assault with intent to maim,

disfigure or disable. There was no evidence of any, of those three acts being committed by Claybrooks, although there was, we think, ample evidence to entitle the jury to find that there was an assault with intent to prevent legal apprehension. The indictment, however, as we have stated, did not aver that offense, and an accused may not be found guilty of an offense not charged. Had the charge been properly laid, we would have no hesitancy in affirming the conviction. Inasmuch as the offense charged was not proven, and the proven offense was not charged, we shall reverse that conviction.

The sixth count averred the attempted robbery of Ms. Baucom with a dangerous and deadly weapon. The evidence showed that Claybrooks was holding a gun under his shirt when he forced his way into the automobile where Ms. Baucom was, and that Ms. Baucom and her fiance were so intimidated that they tried to escape because of the gun. The record reflects that although Mr. Updike, Ms. Baucom's fiance, had testified that Claybrooks, in approaching the car, said, "Help me, help me," Ms. Baucom gave an entirely different version. She told the jury that Claybrooks "came up [to the car], opened the door, put one leg into the car, leaned into the car, and said, 'Get over, get over.'" Mr. Updike, according to the witness, shoved Claybrooks back and responded, "What the hell is going on, what are you doing?" Claybrooks continued to shove and said, "Get over." Ms. Baucom saw a "brown paper bag with money coming out of the top and the barrel of a gun." She explained that four or five inches of the gun barrel were exposed, and she said, "He's got a gun, let's get out of here."

At that point, Parker arrived and pulled Claybrooks from the car. While the fight was going on, Mr. Updike accelerated the car, and they went about "30 or 40 yards and stopped."

It has been held in *Bell v. State*, 5 Md. App. 276, 279, 246 A. 2d 286, 288 (1968), that "[i]ntimidation produced by the use of a weapon, coupled with the apparent ability to execute the implied threat to use it if resistance is offered, are sufficient to establish that a robbery committed was with a

dangerous and deadly weapon." *See also Crum v. State*, 1 Md. App. 132, 227 A. 2d 766 (1967).

In the instant case, the visibility of the gun when viewed in the light of the aggressive act of entry into the vehicle, along with the command, "get over," we believe sufficient to constitute the offense of attempted robbery with a dangerous and deadly weapon.

### iii.

Claybrooks next asserts that his conviction under the fourteenth count, the robbery by the use of a dangerous and deadly weapon of Eldridge Monte Henderson, was based on insufficient evidence. Henderson testified that he was in his Volkswagen, leaving the parking lot situated near the Suburbia building, when Claybrooks came up to the car and said, "Whitey is after me." Claybrooks forced his way into the Henderson vehicle. While attempting to eject Claybrooks from the car, Henderson brushed against something on the upper part of Claybrooks's body which felt like "a pipe or something, . . . I don't know what it was; a round object." He then, in response to a question, said, "I guess it was a gun." That testimony was followed by the victim's stating that Claybrooks said, "Give me the keys or I will blow you away." Henderson surrendered the keys and left the car.

Contrary to Claybrooks's point of view, we believe that evidence sufficient to show the robbery of Henderson, by Claybrooks, of the vehicle. Patently, Henderson was intimidated by what he believed to be a gun, particularly in the light of Claybrooks's comment about "blowing . . . [him] away." *Bell v. State, supra.*

### iv.
### (a)

Claybrooks finds error in the trial judge's instructing the jury "the number of witnesses who may testify is not to be the determinative factor to be considered by you; the test is how persuasive their testimony is. Thus, the positive identification of a single eye witness is ample evidence to sustain a conviction if you believe that witness." Our review

of the trial judge's instructions to the jury indicates that he correctly stated the law. We perceive no error.

(b)

Claybrooks also argues that the court failed to grant his requested instruction #2. Inasmuch as that instruction is not within the record, we are unable to pass upon its validity.

(c)

We agree that there may be some merit in Claybrooks's allegation that there should have been an instruction pertaining to an accessory after the fact, but any error on the part of the trial judge, if error at all, must be viewed in the wake of the substantial testimony that Claybrooks did more than "receive, comfort or assist a felon [Cunningham] knowing that he has committed a felony." *Agresti v. State*, 2 Md. App. 278, 280, 234 A. 2d 284, 285-86 (1967). Indeed, the evidence was overwhelming that Claybrooks was a principal in the commission of the crime, so that even though the instructions did not embrace the law as to accessory after the fact, the lack of that instruction is harmless beyond a reasonable doubt. *Dorsey v. State*, 278 Md. 221, 362 A. 2d 642 (1976). We repeat what we said in *Beckner v. Chalkley*, 19 Md. App. 239, 248, 310 A. 2d 569, 574 (1973), quoting from *Cherry v. Davis*, 59 Ga. 454, 456 (1877), " '[w]rong directions which do not put the traveler out of his way, furnish no reason for repeating the journey.' " We are convinced that in the instant case, even if we consider Judge Mathias's "instructions" to the jury to have been wrong "insofar as they did not advise on the law of accessory after the fact," because of the overwhelming evidence as to Claybrooks's being a principal, we think there is no valid reason "for repeating the journey."

> *Judgment on count two (2) reversed.*
>
> *Judgments on counts 6, 14, 20, 21, and 22 affirmed.*
>
> *Costs to be paid one-sixth by Montgomery County and five-sixths by appellant.*