# NANCY AUSTIN COVER *v.* STATE OF MARYLAND

[No. 121, September Term, 1982.]

*Decided October 26, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Eric M. Schneider, Assigned Public Defender,* on the brief, for appellant.

*Diana G. Motz, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Dwight Price, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

Petitioner, Nancy Austin Cover (Cover), was convicted of hindering "the Bethesda Special Assignment Team of the Montgomery County Police from performing their lawful duties" at a *de novo,* non-jury trial in the Circuit Court for Montgomery County on an appeal from her conviction in the District Court of Maryland. We granted Cover's petition for a writ of certiorari.

Both this Court and the Court of Special Appeals have said that resisting, hindering, or obstructing an officer of the law in the performance of his duties is an offense at common law. *See Busch v. State,* 289 Md. 669, 675, 426 A.2d 954, 957 (1981); *Roddy v. Finnegan,* 43 Md. 490, 505 (1876); *Howard v. State,* 32 Md. App. 75, 82, 359 A.2d 568, 573 (1976). *See also,* R. Perkins, *Criminal Law,* 495-97 (2d ed. 1969). The question presented here is whether the facts in the instant case make out the crime. At 2:30 a.m. in a commercial and residential section of Bethesda, Montgomery County, the accused drove slowly along a public street sounding her automobile horn for up to two minutes for the purpose of alerting an unknown third person that he was under observation by a plainclothes police officer who was suspicious that the third person might attempt to break and enter a storehouse. We shall hold that Petitioner's conduct does not constitute the crime charged.

The facts most favorable to the State are these. Sergeant Francis W. Young (Young) of the Montgomery County police was assigned to the Bethesda Special Assignment Team (SAT). He was in charge of a group of plainclothes officers who daily patrolled the area in unmarked vehicles from 9:30 p.m. to 5:30 a.m. On Wednesday, February 10, 1982 at approximately 2:20 a.m. Young noticed a man in a sidewalk telephone booth outside the front of a building occupied by the Wagon Wheel Restaurant, where a break-in had recently been perpetrated. To set forth what thereafter transpired requires a description of the general area.

The Wagon Wheel Restaurant is in the front of a one-story, freestanding building located on the north side of Bethesda Avenue in the block bounded on the west by Arlington Road and on the east by Wisconsin Avenue. The next east-west street to the north of Bethesda Avenue is Elm Street. Testimony estimated the depth of the block from Bethesda Avenue to Elm Street at 300 feet. Photographs in evidence reveal that, on the north side of Bethesda Avenue, at the Wisconsin Avenue corner of the block, there is an eight-story, office-type building. The next building to the

west is the building housing the Wagon Wheel. Between these two structures is a driveway, two traffic lanes wide, which appears to lead to an underground garage. To the west of the Wagon Wheel building is a service road approximately three lanes wide. On the west side of this service road is an open parking area, one car length in width, which affords perpendicular parking for a one-story building. To the rear, or north, of the one-story building is an open parking lot which is accessible from the service road. What lies immediately behind the Wagon Wheel building, on the east side of the service road, does not appear in the record. West of the one-story building are railroad tracks which cross the subject block diagonally in relation to Bethesda Avenue on a northeast-southwest course. There are other buildings along the north side of Bethesda Avenue from the railroad tracks to Arlington Road. Behind the buildings which face on the north side of Bethesda Avenue, and facing the south side of Elm Street in the portion of the block to the north and slightly to the west of the Wagon Wheel building, are two large, one-story commercial buildings. The more westerly of these is apparently a supermarket and the more easterly an automobile service facility. These two buildings are separated by an open air parking area. There is also open area for parking on the south side of the automobile facility, extending to the railroad tracks, as well as on the east side of that facility. The sidewalk telephone booth in which Young first observed a male subject stands at the western corner of the front of the Wagon Wheel premises, next to the wide service road. Thus, the area from the telephone booth on Bethesda, extending on a somewhat direct course to Elm, consists of the service road, next a parking area, next the railroad tracks, next the parking area behind the auto service facility building, and finally that building with open parking areas on both sides.

On the south side of Bethesda Avenue, at the eastern end of the block, *i.e.,* at the Wisconsin Avenue corner, is a highrise apartment house. To the south of the apartment house is an alley called Miller Avenue which leads to a

county-owned, public parking lot occupying the south side of Bethesda west of the apartment house and directly across Bethesda from the restaurant. The parking lot also has a Bethesda Avenue entrance. On the morning in question the parking lot was "loaded" with the cars of persons who reside in the apartment house.

While Young was driving eastbound on Bethesda in a green Volkswagen, the subject male left the telephone booth and walked around the corner formed by the front and west sides of the restaurant building. When Young reached the end of the block, he proceeded south on Wisconsin Avenue and then by way of Miller Avenue onto the county parking lot. He parked facing west, with the rear of his car to the apartment building, so that the front and part of the east side of the restaurant were in view.

When Young had turned onto Wisconsin Avenue, he noticed that a blue Mazda station wagon had pulled within 15 to 20 feet behind him. Cover was driving the Mazda and was accompanied by a passenger, later identified as Theresa Bowen (Bowen).[1] Petitioner followed Young onto the parking lot, passed in front of his vehicle, made a U-turn, and parked facing to the east in the first space directly to Young's left on the other side of the Miller Avenue entrance to the parking lot. Young recognized Cover and her vehicle because he had seen them many times before.

Cover had previously followed Young, and other SAT officers as well, in the early morning hours on numerous occasions, although there was no evidence that she had ever interfered with any of these plainclothes policemen in the performance of their duties in the past. On one prior occasion Bowen and Cover had been parked opposite the place where the unmarked SAT vehicles were garaged. The pair were observing the officers as they returned from patrol. When Young had gone over to speak to them, Bowen pointed a camera at Young and flashed its lighting attachment.

---

1. Bowen was apparently not charged with any offense arising out of the facts in this case.

Young testified that, on that occasion, while Bowen denied having film in the camera, Cover said the two were preparing a flier containing pictures of the SAT officers and cars for distribution to the burglars of Bethesda and for posting on telephone poles.

On the morning involved in the charge before us, and after Cover had parked on the county lot, Young continued to observe the restaurant through binoculars. The subject came back into view from around the corner and stood on the sidewalk in front of the restaurant. Young radioed for other SAT officers to position themselves in the immediate area. Meanwhile, Cover and Bowen, with the window of the Mazda rolled down, talked to one another in a normal tone and occasionally glanced over at Sgt. Young. After about five minutes Cover started her car and turned on its headlights. At that point Young left his vehicle and approached Cover on foot. Young testified:

> I said to Miss Bowen [*sic*], Miss Bowen, do you know who I am, I'm a police officer and she said, yes. I said, do you — I'm conducting a surveillance of a subject over on Bethesda Avenue, when you leave the parking lot, I want you to leave by Miller Avenue . . . .
>
> . . . .
>
> I then told her that if she drove down Bethesda Avenue that she would be hindering my investigation.
>
> . . . .
>
> She acknowledged that [the preceding statement] and then pulled up onto Miller Avenue straight ahead.

After Cover had proceeded about 50 feet on Miller Avenue toward Wisconsin Avenue, she stopped, backed up onto the parking lot, turned the car around, and drove out of the lot using the Bethesda Avenue exit. She turned left, or westbound, on Bethesda and proceeded at a speed estimated by Young to be one to two miles per hour. As she passed the

subject, no conversation took place with him, and the Mazda went out of Young's line of vision.

Officer Larry Pagley of the SAT group was at that time parked in an unmarked vehicle at the intersection of Arlington with Elm Street. He observed Cover stop for a traffic light at the Bethesda-Arlington intersection and then turn north on Arlington. Cover's station wagon passed him at a very slow speed and he heard laughter from the car as it turned eastbound on Elm Street. At this point Cover began sounding her car's horn and continued to sound it for one and one-half to two minutes, the time it took her to traverse the block of Elm Street between Arlington and Wisconsin. There was no other traffic on Elm Street at the time.

In the period after Cover had left the parking lot, Sgt. Young remained there. He observed the subject again enter the phone booth, and then come out and go around the corner of the building. Young also heard the horn of an automobile on Elm Street. He placed the sound as emanating from Cover's car when he saw the Mazda passing "Euro Motor Cars" on Elm Street. He estimated that two or three minutes had elapsed from the time when he lost sight of Cover's car as it proceeded west on Bethesda until he next saw it on Elm.

After the Mazda had driven away, Young and another officer searched the area around the restaurant building for the subject but did not see him. Young acknowledged that throughout his entire surveillance the subject had not done anything which would give cause for arrest. Young's opinion was that the subject was acting in a generally suspicious manner.

On the evening of February 10 a Commissioner of the District Court issued an arrest warrant on Young's statement of charges, and Cover was taken into custody.

In rendering its guilty verdict the circuit court specifically found that it was Cover's intent to obstruct or hinder the officers, saying:

> [T]he Court doesn't have any doubt that the intention of Miss Cover was to obstruct and interfere and

> to hinder the officers in their official duties. It is a difficult area, you can speculate about a lot of things, but I don't have any difficulty in finding that and find it beyond a reasonable doubt.
>
> I don't know how any SAT team or any stakeouts could ever be conducted if somebody went around blowing their horns or screaming or yelling or doing anything else. I don't see how they could accomplish their task if people were allowed to do this.

This finding concerning intent is not challenged. It is also clear that Cover knew that Young was a police officer and knew that he was observing the activities of a third person. It is the nature of Cover's alleged hindering, coupled with the type of police work involved here, which take this case out of the mainstream of obstructing police officer cases.

In analyzing whether the State has proved a crime on the foregoing facts, we shall begin with cases representing the crime in its clearest form and move outwardly from the central core to the relatively unexplored regions where the instant problem lies. Helpful to this approach are categories of the crime of obstructing a police officer which have been suggested in Lidstone, *The Offence of Obstruction: (2) Obstructing Freedom?,* [1983] Crim. L. Rev. 29. These categories are:

Positive direct obstruction: "[T]hose cases in which the constable acts directly against the citizen or his property and is physically resisted." *Id.* at 30.[2]

---

**2.** *See, e.g.,* United States v. Heliczer, 373 F.2d 241 (2d Cir.), *cert. denied,* 388 U.S. 917, 87 S. Ct. 2133, 18 L. Ed. 2d 1359 (1967) (defendants attacked arresting officers and urged crowd to assist them); Patterson v. State, 141 Ark. 422, 217 S.W. 480 (1920) (defendant pointed a gun at arresting officer); State v. Hailey, 33 S.C.L. (2 Strob.) 73 (1847) (defendant pulled a knife on officer who had warrant to arrest another individual); Saunders v. R., 19 N.S.R. (2d) 73 (1977) (defendant wrestled with officer who was attempting to arrest defendant's companion). We held in Busch v. State, *supra,* 289 Md. at 677, 426 A.2d at 958, that an arrest is not, however, essential to the offense of hindering or obstructing an officer in the performance of his duties. Thus, the offense is committed by assaulting an officer who is attempting to execute a civil writ. *See, e.g.,* Commonwealth v. Field, 13 Mass. 321 (1816) (defendant convicted of assaulting a sheriff's aide who was delivering a writ of debt to defendant's brother); People v. Smith, 131 Mich.

Passive direct obstruction: Those cases "in which the constable seeks to make the citizen act directly, and the citizen refuses or fails to act as required." *Id.*[3]

Positive indirect obstruction: Those cases in which "the police are not acting directly against the citizen but are acting indirectly against other citizens who are, or may be, about to commit offences against the criminal law, and the citizen does an act which obstructs them in their general duty to prevent or detect crime, intending to frustrate the police operation." *Id.*

It is this third category with which we are presently concerned. That category has also been described as "Warning Others of the Presence of Police." See Note, *Types of Activity Encompassed by the Offense of Obstructing a Public Officer,* 108 U. Pa. L. Rev. 388, 396 (1960). In all of the reported cases in the third category the offenses are charged under a statute. However, because the statutes simply express a general prohibition against obstructing, hindering, or interfering with an officer in the performance of his duties, the same problem of scope of the crime is presented under these statutes as is presented in the case at bar under the common law.

In June 1978 a plainclothes police officer stationed on a subway platform in New York kept a surveillance on a third party suspected of a graffiti offense. the defendant recognized the officer and repeatedly shouted that the latter was a policeman in order to warn those within hearing to refrain from doing anything wrong. Charges were brought

70, 90 N.W. 666 (1902) (conviction for resisting an officer who levied upon defendant's property); State v. Richardson, 38 N.H. 208 (1859) (conviction for assaulting and resisting an officer serving a writ of attachment); Braddy v. Hodges, 99 N.C. 319, 5 S.E. 17 (1888) (sheriff assaulted while executing a writ of seizure).

3. Illustrative of the concept presented by Lidstone, and without indicating whether or not the cited cases represent Maryland law, are "failure to move on" cases. *See, e.g.,* City of Chicago v. Meyer, 44 Ill. 2d 1, 253 N.E.2d 400 (1969), *cert. denied,* 397 U.S. 1024, 90 S. Ct. 1262, 25 L. Ed. 2d 534 (1970); City of Chicago v. Lynd, 47 Ill. 2d 205, 265 N.E.2d 116 (1970), *cert. denied,* 402 U.S. 923, 91 S. Ct. 1383, 28 L. Ed. 2d 662 (1971); R. v. August, (1974) 17 C.C.C. (2d) 194 (B.C.); Despard v. Wilcox, 102 L.T.R. 103 (K.B. 1910).

under a statute prohibiting obstructing governmental administration. The Criminal Court of the City of New York, Bronx County, held that the statute was designed to make criminal interruption of administrative governmental operations, and the defendant was acquitted. *People v. Lopez,* 97 Misc. 2d 124, 410 N.Y.S.2d 787 (1978).

Speed traps were involved in two Ohio cases. *City of Warrensville v. Wason,* 50 Ohio App. 2d 21, 361 N.E.2d 546 (1976) involved a motorist who flashed his headlights at oncoming automobiles to warn them that they were approaching a radar speed trap. He was charged under a municipal ordinance which provided:

> "No person shall resist, hinder, obstruct or abuse any official while such official is attempting to arrest offenders under this Traffic Code. No person shall interfere with any person charged under such sections with the enforcement of the law relating to public streets." [*Id.* at 21-22, 361 N.E.2d at 547 (quoting Warrensville Heights, Ohio, Traffic Ordinance § 303.03).]

There was no opinion of the court. One judge concluded that an element of obstruction is the presence of an illegal act which generates the policeman's duty to enforce the law. Because there was no evidence that oncoming cars were speeding, there was no basis for a conviction. This judge relied on *Bastable v. Little,* [1907] 1 K.B. 59 and *Betts v. Stevens,* [1910] 1 K.B. 1, discussed *infra.* A second judge agreed with the foregoing analysis only with respect to the first sentence of the statute but concurred in the judgment because there was in his view no evidence to support a finding of interference. The third judge dissented and essentially reasoned that intentional interference is sufficiently antisocial to be criminal, whether or not the person warned is himself breaking the law.

An earlier Ohio case, decided in the Municipal Court of Akron, also involved an accused who warned of a radar speed trap by flashing headlights at oncoming traffic. He was

acquitted of violating an Ohio motor vehicle statute, substantially similar to the Warrensville ordinance quoted above, because there was no proof oncoming traffic was speeding. *City of Akron v. Matteson,* 63 Ohio Op. 2d 146, 299 N.E.2d 315 (1972).

*Bastable v. Little, supra,* arose in the early days of motoring and involved a defendant who was charged with obstructing constables in the execution of their duty in violation of § 2 of the Prevention of Crimes Amendment Act of 1885.[4] Police, using visual observations and a stop watch, had set up a speed trap over a measured course. The defendant stationed himself in front of the measured course, and by means of various hand signals, alerted approaching drivers. No speeders were apprehended. An acquittal before justices of the peace was affirmed because there was no evidence that any car was exceeding the speed limit when the warnings were given. Lord Alverstone could not "draw the inference that the cars were breaking the law when they received the warning." *Id.* at 62. The opinion of Judge Darling was that

> it is quite easy to distinguish the cases where a warning is given with the object of preventing the commission of a crime from the cases in which the crime is being committed and the warning is given in order that the commission of the crime may be suspended while there is danger of detection, with the intention that the commission of the crime should be re-commenced as soon as the danger is past. [*Id.* at 63.]

Almost identical facts were presented three years later in *Betts v. Stevens,* [1910] 1 K.B. 1. However, in this case

---

4. The Prevention of Crimes Amendment Act, 1885, 48 & 49 Vict., ch. 75, § 2 in part provides:

The provisions of (34 & 35 Vict. ch. 112, § 12) shall apply to all cases of resisting or wilfully obstructing any constable or peace officer when in the execution of his duty . . . .

The Prevention of Crimes Act, 1871, 34 & 35 Vict., ch. 112, § 12 prohibits assault on a constable when in the execution of his duty.

policemen were stationed some distance in advance of the beginning of the measured course, at the point where the accused was standing and giving warning signals. These officers testified that cars were exceeding the limit before they saw the warning, and afterwards reduced speed. The defendant's conviction was affirmed. Lord Alverstone this time reasoned that

> a man who, finding that a car is breaking the law, warns the driver, so that the speed of the car is slackened, and the police are thereby prevented from ascertaining the speed and so are prevented from obtaining the only evidence upon which, according to our experience, Courts will act with confidence, is obstructing the police in the execution of their duty.... However, nothing that I now say must be construed to mean that the mere giving of a warning to a passing car that the driver must look out as there is a police trap ahead will amount to an obstruction of the police in the execution of their duty in the absence of evidence that the car was going at an illegal speed at the time of the warning given; but where it is found, as in this case, that the cars were already breaking the law at the time of the warning, and that the act of the person giving the warning prevented the police from getting the only evidence which would be required for the purposes of the case, there I think the warning does amount to obstruction. [*Id.* at 6-7.]

The opinion of Judge Darling was essentially as follows:

> The appellant in effect advised the drivers of those cars which were proceeding at an unlawful speed not to go on committing an unlawful act. If that advice were given simply with a view to prevent the continuance of the unlawful act and procure observance of the law, I should say that there would not be an obstruction of the police in the execution of their duty of collecting evidence beyond the point

at which the appellant intervened. The gist of the offence to my mind lies in the intention with which the thing is done. . . . Here I think it is perfectly plain upon the facts found by the magistrates in this case that the object of Betts' intervention was that the offence which was being committed should be suspended or desisted from merely whilst there was danger of the police detecting it and taking evidence of it, and that therefore he was obstructing the police in their duty to collect evidence of an offence which had been committed and was being committed. He did that wilfully in order to obstruct them in their duty, and not in order to assist them in the performance of their duty, nor in order to prevent a motorist upon the road from committing an offence. [*Id.* at 8-9.]

*Bastable* was distinguished in *Hinchliffe v. Sheldon,* [1955] 3 All E.R. 406, D.C. There the son of innkeepers, while returning home after the legal hours for the sale of alcoholic beverages, noticed that police were observing the inn. He shouted warnings with the result that his parents did not unlock the doors for some eight minutes after the police demanded entry. By that time there was no evidence of after-hours drinking. Absent evidence of any illegal activity, it would seem that under *Bastable* the son should have been acquitted of obstruction; however, his conviction was affirmed. The police had a right, under the Licensing Act, to enter the licensed premises at any time, whether or not an offense was being committed, and the son's actions prevented the police from executing that duty. All members of the divisional court joined in a judgment which defined "obstructing" as "making it more difficult for the police to carry out their duties." *Id.* at 408. *Hinchliffe* suggests that when the police are carrying out some specific duty, as opposed to their general duties, proof of an illegal activity is not required to sustain a conviction for obstruction.

The definition of obstructing as "any act which makes it more difficult for the police to carry out their duty" was

applied in *Rice v. Connolly,* [1966] 2 All E.R. 649, D.C.[5] A police constable, suspicious of Rice who was looking in the windows of closed shops, demanded that he identify himself. When Rice refused to state more than his surname and the road on which he resided, the P.C. required the subject to come with him to a police box. In the lead judgment, Lord Parker first found obstructing under the quoted definition, and next directed attention to the element of willfulness, which was said to include an absence of lawful excuse. Because Rice could have remained totally silent, and he did not lie in what he did say, his conviction was quashed.

The British Columbia Court of Appeal, in *Regina v. Westlie,* [1971] 2 W.W.R. 417, 2 C.C.C.2d 315, reviewed this line of cases but took a somewhat different approach in its analysis. Plainclothes officers had been patrolling a "skid row" area of Vancouver primarily to detect and arrest beggars. The appellant had learned that the complaining witnesses were policemen when they arrested a third party. Appellant then followed the officers for some time, stopped people on the street, pointed to the officers and referred to them as "Undercover pigs," and "Undercover fuzz." A conviction for obstructing the officers in the execution of their duty was affirmed. The court distinguished *Bastable* on what might be termed a "complete frustration" principle.

> [T]he appellant, despite his knowledge of the identity of the police officers and the particular duty in which they were engaged, did everything to identify them to the public and thus completely frustrate the police officers in the execution of their duty in which they were engaged so that the police officers had to give up. True it is that the police officers found no one begging in the area . . . . However, it was equally true that it was hopeless for the police officers to expect to detect beggars, having regard to

---

5. Prosecution was under the Police Act, 1964, 12 & 13 Eliz. 2, ch. 48, § 51 (3), the statutory successor to § 2 of the Prevention of Crimes Amendment Act, 1885.

> the continued publicity given to their identity by the appellant to all and sundry. That was not only conduct amounting to obstruction but conduct which completely frustrated the police officers in the execution of their duty. [Opinion of Branca, C.J., *id.* at 424-25, 2 C.C.C.2d at 323.]

This line of cases currently culminates in *Green v. Moore,* [1982] 1 All E.R. 428, D.C. Green, a probationary police constable, was a "regular" at a local bar. He learned that a special team of police intended to raid the bar that very evening, if a plainclothes officer patronizing the bar signaled after closing time that after-hours violations were occurring. Green told the licensee of the impending raid and, on that night at least, the licensee shut down at the required hour. Green's conviction in magistrates' court of willfully obstructing the police in the execution of their duty was reversed on appeal to a crown court as a matter of law. On a case stated to the divisional court this legal ruling was reversed. The divisional court agreed with *Bastable* that if someone warns law-abiding citizens not to violate the law, then no offense has occurred. But the court could not

> see any distinction between a warning given in order that the commission of a crime may be suspended whilst there is danger of detection, which is an offence (see BETTS v. STEVENS (*supra*)) and one which is given in order that the commission of a crime may be postponed until after the danger of detection has passed. [*Id.* at 432.]

The court set forth three questions which must be affirmatively answered to establish the offense: "(1) *Was there any obstruction of a constable?*"; "(2) *Was the constable acting lawfully in the execution of his duty?*"; and "(3) *Was the obstruction intended to obstruct the constables in the execution of their duty?*" *Id.* at 432-33 (emphasis in original).

In *Green,* the requisite intent was not in issue. There was an obstruction because the police "were deprived of the opportunity of seeing whether, in normal circumstances, the

landlord would observe statutory closing hours." *Id.* at 433. The police were exercising their duty because duty is *not* limited to detecting "offences which are being or have been committed." *Id.*

From all of the foregoing authorities it appears that, in general, the elements of the offense of obstructing or hindering a police officer are:

> (1) A police officer engaged in the performance of a duty;
>
> (2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;
>
> (3) Knowledge by the accused of facts comprising element (1); and
>
> (4) Intent to obstruct or hinder the officer by the act or omission constituting element (2).

The difficult questions arise in determining what constitutes "duty" and what acts or omissions constitute obstructing or hindering the performance of duty.

Under the *Bastable* approach, which has been followed in the few American decisions involving "Positive indirect obstruction," the third person whom the officer seeks to observe must be engaged in some unlawful activity, in order to make out the offense. Under this test the conviction in the instant matter clearly falls. In order for the facts of Cover's case to include the "duty" element of the common law offense, "duty" would have to be defined to embrace an officer's undertaking the surveillance of lawful, *i.e.,* non-criminal, activity. We shall assume, for purposes of the case at hand, that the duty element has that broad a scope.[6]

---

6. One writer, in criticizing Green v. Moore, *supra,* has urged the need for some limiting principle so that the duty element does not become any conduct which is related to law enforcement and which is not itself unlawful. Gibbons, *The Offence of Obstruction: (1) Obstructing a Constable — The Emergence of a New Duty to Co-Operate With the Police,* [1983] Crim. L. Rev. 21, 25 says:

> All these duties [of an officer] are stated at a rather abstract level and do not stipulate particular courses of action so, provided

Further, to reach the indirect type of conduct which formed the basis for the conviction at the case at bar, it is necessary to define an act of hindering to include an act which deprived Officer Young of the opportunity of seeing whether, in normal circumstances, the unidentified subject would attempt to break and enter the Wagon Wheel Restaurant. This broad concept of an act of hindering was utilized in *Green v. Moore.* We shall assume, *arguendo,* that the common law crime embraces such a broad concept.

Nevertheless, even when we make the two foregoing assumptions, the State's evidence was legally insufficient to convict Cover. The critical element of the State's theory of the case is that, by sounding her automobile horn, Cover warned the subject that he was being observed by the police. There is no evidence that, after Cover had left the parking lot, she communicated in any way with the subject when Cover slowly drove past him while he was standing outside the Wagon Wheel. More than two minutes elapsed from that time before Cover first sounded her horn. She sounded her horn on a street one block distant and, measuring on a direct line from Bethesda Avenue, on a street 300 feet from the point where the subject was last seen. The evidence does not support the inference that the subject, standing in the vicin-

---

that the constable's ultimate objective is law enforcement and provided that the means adopted do not in themselves break the law, it will be difficult to establish that any action taken by a constable is outside his duty. Indeed, because the constable's function is defined in terms of these general duties, doing what constables (usually police officers) lawfully do will be in the execution of his duty and this will encompass the practical lessons of effective policing drawn from experience and accumulated wisdom. The courts will not concern themselves with the way in which the police exercise their discretion, so it is unlikely that they will scrutinise particular manifestations of suspicion, inquisitiveness and authority which may be seen by practical police officers as being an essential and self-preserving attitude to adopt in encounters with citizens. In practice, therefore, the constable's duty consists of whatever the police officer considers to be necessary for doing the job. [Footnotes omitted.]

That author then puts a number of hypothetical cases, including asking, "[i]f the policeman is looking through a window in order to detect whether some activity in a house amounts to a crime, would it not be an offense [under the Green v. Moore approach] for the householder to draw the curtains to obscure his vision?" *Id.* at 27 (footnote omitted).

ity of the Wagon Wheel Restaurant, would relate the moving sound of an automobile horn on the next street with a person who had some minutes before been on Bethesda Avenue. It is not reasonable to infer, under the time, distance and physical circumstances of the instant matter, that one standing near the Wagon Wheel Restaurant would conclude from the moving sound of an automobile horn a block away from Bethesda Avenue that the individual sounding the horn is volunteering a warning of police presence on Bethesda Avenue. The much more likely inference is that the horn blower is a reveler. It is simply speculation to conclude that the subject remained in the vicinity of the Wagon Wheel until the automobile horn was sounded on Elm Street, and that the subject then left the restaurant area because of the sounding of the horn. Even if *Regina v. Westlie* and *Green v. Moore,* both *supra,* are proper applications of the law, the Crown was at least able to prove in those cases that a warning had in fact been given to third persons.

In the instant matter, while the State had sufficient evidence to support a finding that it was Cover's intent to warn, the evidence was insufficient to support a finding beyond a reasonable doubt that the sounding of the car horn was understood as a warning and in fact hindered Officer Young from further observing the subject.

The State argues that "[a]n obstruction or hinderance need not be wholly or partially successful; it need not make the job of the police officer impossible or even more difficult; rather it is the *intent* to hinder or obstruct that is important." (Emphasis in original). Petitioner has not contested the validity of this statement of law. However, all of the cases cited by the State to support this proposition, in which hindering a police officer was charged, factually involved a direct type of alleged obstruction.[7] Here the alleged

---

7. These are: State v. Brown, 33 Conn. Supp. 515, 356 A.2d 913 (1976) (positive direct obstruction, by words); State v. Harris, 4 Conn. Cir. 534, 236 A.2d 479 (1967) (same); State v. Manning, 146 N.J. Super. 589, 370 A.2d 499 (1977) (passive direct obstruction, by failure to obey order); State v. Taylor, 38 N.J. Super. 6, 118 A.2d 36 (1955) (both positive, by words, and passive, by failure to move on).

hindering is indirect. Cover's sounding of the car horn is so remote in relation to hindering Sergeant Young, even by depriving him of the opportunity for further observation, that the State failed to demonstrate a sufficient causal connection between the sounding and the subject's apparent departure from the scene. Contrary to the implication of the State's argument, where the alleged hindering is as indirect as that presented here, we cannot conclude that the crime may be based solely on intent, without regard to whether there has in fact been some degree of hindrance. "To uphold such an argument would be to ignore a basic premise of Anglo-American law that no crime is committed by the mere harboring of evil intent not accompanied by an act, or an omission to act where there is a legal duty to act." *In re Leroy T.*, 285 Md. 508, 513, 403 A.2d 1226, 1229 (1979).

> *Judgment of the Circuit Court for Montgomery County reversed.*
> *Costs to be paid by Montgomery County.*