702 A.2d 961

**Reynaldo Jorge BARRIOS, Dajuan Waitque Graham, Antjuan Trevell Hillson and Pablo Francis Diaz**

v.

**STATE of Maryland.**

**No. 171, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Dec. 2, 1997.

Michael R. Malloy, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellants.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen, Baltimore and Robert Dean, State's Atty. for Montgomery County, Rockville, on the brief), for Appellee.

Submitted before JOSEPH F. MURPHY, Jr., C.J., and MOYLAN, J., and ROBERT C. MURPHY, J. (Retired, Specially Assigned).

ROBERT C. MURPHY, Judge, Retired, Specially Assigned.

Appellants, Reynaldo Barrios, Dajuan Graham, Antjuan Hillson, and Pablo Diaz, were convicted by a jury sitting in the Circuit Court for Montgomery County (Pincus, J., presiding) of two counts of assault with intent to prevent lawful apprehension and one count of obstructing and hindering a police officer. Appellants Barrios and Hillson were sentenced to concurrent five-year terms of incarceration, with all but sixteen months suspended, for each of the convictions. Appellant Graham was sentenced to ten years imprisonment on one count of assault with intent to prevent lawful apprehension and concurrent five-year terms for the remaining convictions, all but sixteen months of each sentence was suspended. Appellant Diaz was sentenced to concurrent five-year terms of incarceration, with all but one year suspended, for each conviction. Appellants noted timely appeals and present three questions for our review:

I. Did the trial court abuse its discretion in denying appellants' motions for mistrial based on courtroom security measures that allegedly prejudiced the jurors against appellants?

II. Did the trial court err in declining to give appellants' requested jury instruction on the definition of assault with intent to prevent lawful apprehension?

III. Was the evidence sufficient to sustain appellants' convictions?

### FACTS

On April 27, 1996, at approximately 5:30 p.m., Sergeant Ronald Hardy of the Montgomery County Police Department responded to Edgewood Park for a report of a fight in progress. Tom Berson, a reporter for the *Montgomery Journal,* was riding with the sergeant at the time. Upon arriving at the park, the sergeant saw no signs of a disturbance. He did see a group of about twenty individuals, ages fourteen to twenty, walking up a footpath. As Sergeant Hardy turned to leave, he observed a verbal altercation erupt between two

young men. At trial, the sergeant testified that Appellant Hillson was one of the men involved in the argument. In order to break up the altercation, the sergeant grabbed Appellant Hillson by the arm and told him to calm down. Approximately ten black males approached the scene and cursed the sergeant, telling him that he had no right to stop Hillson. Officers Gary Turner and Gill Lee then arrived on the scene. The officers calmed the group down and were leaving the park when another argument broke out. As the three officers approached the individuals who were arguing, they observed another young man, later identified as Leon Boyd, swing a tree branch at several other young men. Officer Turner yelled at Boyd to drop the branch. Boyd did so and ran into a nearby apartment building with Turner and Hardy in pursuit. The officers testified at trial that they pursued Boyd because there were open warrants for his arrest.

Officer Turner stopped Boyd in the hallway of the apartment building, told him that he was under arrest, and ordered him to get on the ground. Officer Turner testified that Boyd responded that the officer was going to have to shoot him. The officer took hold of Boyd to effect the arrest and Boyd resisted. Sergeant Hardy then stepped into the hallway and assisted Officer Turner. Boyd continued to struggle and Sergeant Hardy was able to place the handcuffs only on Boyd's left wrist. As the officers started to pull Boyd's right arm behind his body, a crowd of about twenty to twenty five individuals ran into the hallway. They began pulling on Boyd and tugging at Sergeant Hardy. The crowd was also yelling at the officers to leave Boyd alone and that he had not done anything. The officers told the crowd that Boyd was under arrest and that they should get back and calm down. Officer Lee had entered the hallway with the crowd and attempted to aid the other officers. Sergeant Hardy testified that members of the crowd were tugging on his arm and pulling the officers and Boyd toward the front of the building.

Officer Turner testified that the four appellants were in the hallway, refused to back up, and were chanting, "Let him go; let him go...." Officer Turner added that Appellant Barrios

pushed him back against the wall and that Appellant Graham was pushing into the crowd that was pushing against the officers. The officer further stated that Appellants Hillson and Diaz grabbed Boyd and attempted to pull him away from the officers. During the altercation, Boyd bit Officer Turner on the arm.

At some point, Officer Lee informed the other officers that someone was trying to take his gun. Someone ripped Officer Turner's radio from his body. Sergeant Hardy pushed the emergency button on his police radio to call for immediate help. Sergeant Hardy then decided to release Boyd because Boyd was being arrested on open misdemeanor warrants, the officers knew who he was, and the sergeant was concerned for the safety of the officers and the individuals in the crowd. Sergeant Hardy added that Officer Turner knew the individuals involved in the altercation. When the officers released Boyd, he ran out of the building, across the parking lot, and disappeared. The crowd immediately dispersed.

Sergeant Hardy was unable to identify anyone in the hallway except for Boyd and did not recall seeing any of the appellants there. Officer Turner testified that the appellants were the first four individuals in the crowd that entered the hallway. He conceded that in the report he wrote six days after the incident, he did not name any of the appellants as having been in the hallway. Officer Turner also testified that prior to the date in question, he had informed Appellants Diaz, Graham, and Barrios that there were outstanding warrants for Boyd's arrest. The officer had never informed Appellant Hillson of the outstanding warrants.

Donna Chandler, who lived at the apartment complex, heard the commotion in the hallway and observed the three officers struggling with about twenty individuals. Ms. Chandler called the police. Ms. Chandler also testified that she saw a young man with one handcuff on his wrist stumble out of the building. His friends helped him get away and told him to get up and run.

Tom Berson, the reporter riding along with Sergeant Hardy, testified that as Sergeant Hardy tried to calm down the young people, Berson walked away to speak with some other individuals and eventually lost sight of the sergeant. Later, Mr. Berson observed a group of about twenty younger people, who had been gathered around a building, run off in different directions.

In the defense case, Grace Broadus, Appellant Hillson's mother, testified that she was visiting with a friend who lived near Edgewood Park when she observed two police cars go by. Ms. Broadus stated that two of her sons were at the park so she left her friend's house and drove there. At the park, Ms. Broadus saw her stepson, who informed her that Sergeant Hardy had been in contact with her son, Appellant Hillson. Ms. Broadus testified that she began to look for Sergeant Hardy to discuss what had happened. In looking around the park, she ended up at the apartment building in question and heard a young woman yelling. "[T]hey are beating him." Ms. Broadus stated that she looked in the apartment building and saw the three officers struggling with four or five people. She stated that she came to the officers' aid and helped to pull someone off of Sergeant Hardy. She added that her son was not involved with the officers, but that he tried to protect her. At one point, Ms. Broadus was knocked to the ground and Appellant Hillson tried to pull her out of the crowd. Ms. Broadus stated that after the crowd had dispersed, she walked with the officers back to the parking lot and Officer Turner informed her that "all gloves were off, and that he would have all of them arrested." Ms. Broadus added that she did not see Appellants Graham, Barrios, or Diaz in the hallway while she attempted to assist the officers.

Betty Smith testified that on the date in question she was residing in the apartment building directly across from the building where the altercation occurred. She stated that from her balcony she observed a young man run from the apartment followed by a crowd of teenagers. Ms. Smith stated that she also saw Appellant Barrios, but that he was standing beside another building, a good distance away from the scene.

Kimberly Jones testified that Appellant Graham was her cousin and that at the time of the incident in question, he was living in her house. Ms. Jones stated that she was at Edgewood Park with her daughter and two nieces on the afternoon of the altercation. Ms. Jones stated that a fight erupted, a group of people started running, and Appellant Graham attempted to go with the crowd, but Ms. Jones prevented him from doing so. Ms. Jones testified that she grabbed him, placed her arm around his neck, and told him that he did not need to go with his friends and that he was staying with her.

Lisa Atkins corroborated Ms. Jones' testimony, stating that she was in the park on the day in question and observed Ms. Jones prevent Appellant Graham from going to the apartment building where the police officers had chased a young man. Ms. Atkins also stated that Appellants Diaz and Barrios left the area before the crowd moved toward the apartment building. She further testified that Appellant Hillson did not make his way toward the apartment building until five or ten minutes after the crowd had headed in that direction.

India Taylor testified that she was also in Edgewood Park on the date in question and that she and Appellant Diaz left the park together and went to his home. She stated that as they were leaving the park, she heard yelling and shouting. Annie Diaz, Appellant Diaz's sister, testified that Ms. Taylor and Appellant Diaz came home together and stayed there.

We will include additional facts as necessary in our discussion of the questions presented.

## DISCUSSION

### I.

Prior to trial, appellants objected to the presence of a metal detector in the hallway outside the courtroom. Counsel stated that Appellant Hillson's defense counsel "had heard a statement by a person who was a prospective juror in another case in another courtroom which as I understand—as I took it

down is, I wonder why they are doing all the security for that case." Counsel continued:

And since metal detectors and security are not usually present in trials in Montgomery County Circuit Court, there is an implication by the fact that they are present here that these defendants and or their relatives or associates are people about whom the prospective jurors and jurors need to be concerned—for potential for violence, and we would object for that reason.

The trial court did not respond to counsel's objection.

Thereafter, prior to the afternoon session on the second day of trial, a motion for mistrial was made by Appellant Hillson's counsel. Counsel alleged that

shortly after the lunch recess, and before the jury had completely cleared the courtroom, there was an incident or altercation between my client, Mr. Hillson, and a member of the sheriff's department here in the courtroom. Apparently some words were exchanged between the two.

\* \* \*

Not [a] physical altercation, Your Honor, a verbal altercation, an interplay between the two. And the—according to a witness who was present in the courtroom, this conversation was overheard and observed by members of the jury who had not yet cleared the courtroom.

In addition to which, after the lunch recess, and while the jury was in the hallway, a member of the Sheriff's Department approached me in a way that was clearly observable to the members of the jury in the hallway and began to discuss this incident in a way that, in my opinion, was clearly apparent to the members of the jury in the hallway.

I think [this] creates clear prejudice on the part—in the minds of the jurors as to the combination of these events combined with the undercover officers who are here in the courtroom.

There has been as far as I know perhaps one spectator who is not a member of either the Sheriff's Department or

an undercover police officer or sheriff in the courtroom, and at this impression [sic] it is clearly apparent to the jury and creates prejudice on behalf—prejudice against Mr. Hillson sufficient to warrant a mistrial.

Counsel for Appellant Diaz joined the motion for mistrial based on "the excessive police presence within the courtroom and outside in the immediate waiting area." Counsel for Appellants Graham and Barrios also joined the motion for mistrial.

The State's Attorney proffered that he had observed the incident in question and explained that it arose from some visual contact between Appellant Hillson, who was free on bond, and Appellant Diaz, who was incarcerated at the time of trial. The State's Attorney explained that it was important to prevent the two incarcerated defendants from having contact with the defendants who were free on bond, as they could be passing something between them.[1] In addition, if any contact occurred, the sheriffs would have to search the incarcerated defendants again. The court renewed its admonition that appellants have no contact. The court then denied the motions for mistrial, stating:

[I]t has been made apparent to the Court starting yesterday that the sheriffs have good reason to have knowledge that there is—the potential for problems in this case security-wise—and additionally this morning, there was something of a significant happenstance when one of the defendants refused to go to his cell and had to be coerced, if you will, or wrestled into the cell.

And another of the defendants apparently mouthed off quite a bit to the sheriffs ..., so they are just doing their job, but I am going to deny the grounds for mistrial.

When the jury returned to the courtroom, the trial court gave the following curative instruction:

---

1. Appellants Hillson and Graham were free on bond at the time of trial. Appellants Diaz and Barrios were incarcerated during trial.

I just wanted to say one word, that anything that any members of the jury may have seen, or if there is anything in the future that may occur, but particularly anything that may have occurred after I excused you, or that some of you may have witnessed, anything that went on between any counsel in this case and any court personnel is to be completely disregarded by you.

It has nothing to do whatsoever with the merits of this case. Anything you may or may not have witnessed, it is immaterial completely and completely irrelevant to this case, so just please disregard [it].

At the close of all the evidence, counsel for Appellant Diaz again moved for mistrial, which counsel for the remaining appellants joined, and the following exchange occurred:

[DEFENSE COUNSEL]: Your Honor, on behalf of Mr. Diaz at this time I would once again move for mistrial. And the basis for my motion at this time is the undue and excessive security presence in the courtroom and in the lobby area outside of the courtroom.

At one point yesterday afternoon, counsel was able to observe in the gallery and in the courtroom eight uniformed members of the Sheriff's Department. There were no civilians in the gallery at that time, so that the view which I had of the gallery was exactly the view which each and every member of the jury panel had.

They have been sitting in the lobby area. They have not been confined to the jury room during the recesses or during the gathering times before court begins in the morning.

THE COURT: There is also a metal detector outside.

[DEFENSE COUNSEL]: So that when they sit in the lobby area, they are aware of the fact there are two courtrooms where a trial has gone on this week on this floor.

THE COURT: There are probably four for the record.

[DEFENSE COUNSEL]: Well, four trials. And that jurors in those—those other two courtrooms have not gone through a metal detector.

They obviously have seen sheriffs present at this end of the hall and not at the other end of the hall where there are two courtrooms where trials have gone on during the same period of time.

There is absolutely—it is my argument to this Court that no reasonable juror sitting there in that juror box or out in the lobby area can but wonder and speculate why.

What is different about this trial? What is different about these young men who have been accused of crimes? That there are police witnesses in this case.

The possibility for speculation is at such a level that my client's ability to receive a fair trial in this courtroom has been irreparably damaged, and I would move for a mistrial on those grounds.

THE COURT: Okay. It will be denied. And for the record, I will state that from the beginning of this trial when the sheriff came to this member of the bench and indicated what their security plans were, their heightened security plans, they based it on the fact that they had information that there was a real responsibility [sic] for violence.

I will note that this is Thursday. That on Tuesday morning, there was an incident in lockup with at least two defendants. One of whom tussled with the sheriffs with respect to going into his cell.

And I am just informed this morning that a very similar incident occurred again this morning where there was real resistance to placing a particular defendant in the cell or in the cell block, although I am not privy to the exact details.

In any event, there may be more. I am not sure, but that is what I am aware of.

[DEFENSE COUNSEL]: To complete the record then, when I asked the captain in charge the reason for the use of the metal detector on the first day of trial before jury

selection had been begun, I was informed that the presence of an individual in the gallery together with four defendants in one trial were the factors which necessitated this extremely unusual action.

The individual who was present in the gallery for one day of this trial, it is my understanding, was convicted in another courtroom in this courthouse this week.

And I do not believe that the metal detector nor eight sheriffs were used in that particular courtroom.

THE COURT: And in closing before we bring the jury back in, I will note that there is a permanent metal detector in the Domestic Relations branch of this court.

Appellant Hillson's counsel added that "whatever may or may not have happened with the two defendants that are incarcerated should not in any way cause this jury to speculate, be tainted in any way to my client, Mr. Hillson, who is not incarcerated." The trial court responded:

That will be denied. And I will just answer briefly, I suspect, by the fact that coupled with threats of potential violence, I suspect, enhanced or reinforced the sheriff's feelings about the necessity for heightened security in this matter.

Appellants contend that "no adequate basis was shown for the extreme security measures taken at [their] trial." They stress that a metal detector was placed outside the courtroom when such detectors were not located outside other criminal courtrooms, that two of the appellants were free on bail, and that almost all of the spectators at their trial were law enforcement personnel. Appellants claim that this was security "overkill" and that "[t]he jurors would inevitably conclude that there was information known to law enforcement officers that the [a]ppellants were very dangerous and violent criminals." Accordingly, appellants allege that the trial court abused its discretion in denying their motions for mistrial.

" '[T]he declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice.' " *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218

(1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991) (quoting *Jones v. State,* 310 Md. 569, 587, 530 A.2d 743 (1987)). The granting of a motion for a mistrial is committed to the sound discretion of the trial court. *Poole v. State,* 295 Md. 167, 183, 453 A.2d 1218 (1983). "We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion." *Hunt,* 321 Md. at 422, 583 A.2d 218.

 "The trial judge has broad discretion in maintaining courtroom security." *Whittlesey v. State,* 340 Md. 30, 84, 665 A.2d 223 (1995), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996). "The reviewing court should not determine whether less stringent security measures were available to the trial court, but rather whether the measures applied were reasonable and whether they posed an unacceptable risk of prejudice to the defendant." *Hunt,* 321 Md. at 408, 583 A.2d 218. In *Bowers v. State,* 306 Md. 120, 133–34, 507 A.2d 1072, *cert. denied,* 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986), the Court of Appeals quoted from *United States v. Samuel,* 431 F.2d 610, 615 (4th Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 964, 28 L.Ed.2d 229 (1971) (citations omitted), to discuss the issue of discretion:

> It is [the trial judge] who is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the prevention of other crimes. As a discretionary matter, the district judge's decision with regard to measure[s] for security is subject to limited review to determine if it was abused. We stress that the discretion is that of the district judge. He may not, as is suggested at one part in the record before us, delegate that discretion to the Marshal. Of course, he should consult with the Marshal when other than ordinary security such as the general presence of guards in the courtroom is contemplated, and he may rely heavily on the Marshal's advice as to what may be required since it is the Marshal who has the experience in the keeping of prisoners and who must pro-

vide the guards and bear the major responsibility if unto-ward incidents occur.

■ In the present case, increased security was required as there were four defendants on trial in one courtroom. It is also apparent from the above quoted exchanges that the Sheriff's Department met with the trial court concerning security measures as threats of violence had been made in regard to the trial. Furthermore, one or both of the appellants who were incarcerated at the time of trial were uncooperative with the sheriffs and had to be physically forced into their cells. Finally, there was a concern of contact between the appellants who were free on bail and those who were incarcerated. At one point, there was a visual exchange between an appellant who was incarcerated and Appellant Hillson, who was not incarcerated. Although two of the appellants were free on bail, based on the nature of the crimes charged and the attempted communication between appellants after they had been admonished to conduct no such communications, there was the real possibility that the two appellants who were not incarcerated would support or further any disruptive behavior on the part of the incarcerated appellants. We perceive no abuse on the part of the trial court in approving the sheriff's security measures and, thus, hold that the trial court properly denied appellants' motions for mistrial.

## II.

■ At the close of all the evidence, appellants, through Appellant Graham's counsel, requested that the trial court instruct the jury that in order to convict appellants of the crime of assault with intent to prevent lawful apprehension,

the jury must find that ... the defendants knew that the apprehension or detention of Leon Boyd that was being attempted was lawful, and that the jury must also find that it was Leon Boyd, and the defendants knew it was Leon Boyd who the officers were trying to apprehend.

The trial court declined to give the instruction, finding that the State had to prove only that there was a lawful apprehen-

sion or detention and that the appellants did not have to make a determination as to the legality of that apprehension or detention. Appellants objected to the court's failure to give the instruction.

Appellants allege that Md.Code (1957, 1992 Repl. Vol.), Art. 27, § 386, under which they were convicted of assault with intent to prevent lawful apprehension, "requires the State to prove that the defendants *actually* knew that the police were acting lawfully in making the arrest." Appellants further claim that the State also had to demonstrate "that the defendants knew that the subject being arrested was the person who was designated in the indictment count charging the defendants with the crime." Accordingly, appellants claim that the trial court erred in failing to give the requested jury instruction.[2]

Maryland Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

This rule "has been interpreted to require that a requested instruction be given only when there is evidence in the record to support it." *Hof v. State*, 337 Md. 581, 612, 655 A.2d 370 (1995).

Article 27, § 386 provides in relevant part:

---

2. Chapter 632 of the Acts of 1996 repealed what had been Article 27, § 386, including the statutory crime of Assault with Intent to Prevent Lawful Apprehension. The repealer of § 386 does not, however, affect our .decision in this case because the Maryland Legislature expressly provided that the new Act would take effect on October 1, 1996 and that its provisions would not apply to any offense committed on or before that date. The Assault with Intent to Prevent Apprehension in . this case occurred on April 27,1996, prior to the effective date of the new Act.

If any person ... shall assault or beat any person ... with intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained, every such offender ... shall be guilty of a felony and, upon conviction are subject to imprisonment for not more than 15 years.

■ The cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intent. *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994). "The starting point in statutory interpretation is with an examination of the language of the statute. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written." *Jones v. State,* 336 Md. 255, 260–61, 647 A.2d 1204 (1994) (citations omitted). "When the words of the statute are clear and unambiguous, we need not go further." *State v. Thompson,* 332 Md. 1, 7, 629 A.2d 731 (1993). In addition, "courts must read all parts of a statute together, with a view toward harmonizing the various parts and avoiding both inconsistencies and senseless results that could not reasonably have been intended by the Legislature." *Barr v. State,* 101 Md.App. 681, 687, 647 A.2d 1293 (1994).

Section 386 allows for alternative forms of assault and alternative states of mind. In the present case, the State had to prove that appellants assaulted or beat any person "[w]ith intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained." *Richmond v. State,* 330 Md. 223, 229–30, 623 A.2d 630 (1993). *See also Hall v. State,* 69 Md.App. 37, 48, 516 A.2d 204 (1986) ("The *mens rea* required to render one guilty of this crime is an 'intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained.' ")

In *Claybrooks v. State,* 36 Md.App. 295, 374 A.2d 365 (1977), a bank was robbed. A citizen in a bar across the street

followed one of the robbers and attempted to detain him. The citizen was hit on the upper back and fell to the ground. Both robbers then climbed into a car and the citizen tried to pull them from the vehicle. The citizen was struck over the head by the barrel of a gun and sustained a slight wound. This Court held that although the evidence was sufficient to sustain a conviction for assault with intent to prevent lawful apprehension, Claybrooks was not charged with that offense and thus could not be convicted of it. *Id.* at 314, 374 A.2d 365. Nonetheless, *Claybrooks* is instructive as a private citizen attempted to make an arrest and no inquiry was made into the actual knowledge of the robbers regarding the lawfulness of a citizen's arrest under the facts of that case.

We hold that section 386 contains no requirement that appellants have actual knowledge that the police were lawfully arresting Boyd or that they have knowledge that Boyd was the individual being arrested. To require actual knowledge on the part of appellants would expand the statute, adding two elements that are simply not there. *See Amalgamated Casualty Ins. Co. v. Helms*, 239 Md. 529, 534–35, 212 A.2d 311 (1965) ("To supply omissions [in a statute] transcends the judicial function.") The requirement that the arrest be lawful must only be proven by the State at trial. We perceive no abuse of discretion on the part of the trial court in declining to give the requested instruction on the crime of assault with intent to prevent lawful apprehension.

### III.

Appellants next contend that the evidence was insufficient to sustain their convictions. Appellant Graham claims that Officer Turner had testified only that Graham was pushing into the crowd that was pushing against the officers. All of the appellants allege that, given the confusion in the hallway, Officer Turner could have been mistaken in his identifications of them. Appellants also argue that the evidence did not demonstrate that they had reason to believe that Boyd was being legally arrested.

The standard for our review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Wilson v. State,* 319 Md. 530, 535, 573 A.2d 831 (1990). The jury, as the trier of fact, may " 'draw reasonable inferences from basic facts to ultimate facts.' " *Barnhard v. State,* 86 Md.App. 518, 532, 587 A.2d 561 (1991), *aff'd,* 325 Md. 602, 602 A.2d 701 (1992) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Weighing the credibility of the witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder. *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991). In performing its fact finding role, the jury is free to accept the evidence that it believes and reject that which it does not. *Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd,* 308 Md. 208, 517 A.2d 1105 (1986). "In this regard, it may believe one witness's testimony, but disbelieve another witness's testimony." *Shand v. State,* 103 Md.App. 465, 489, 653 A.2d 1000 (1995), *aff'd on other grounds,* 341 Md. 661, 672 A.2d 630 (1996).

As explained in Question II, *supra,* section 386 allows for alternative forms of assault and alternative states of mind. In the present case, the State had to prove that appellants assaulted or beat any person "[w]ith intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained." *Richmond v. State,* 330 Md. 223, 229–30, 623 A.2d 630 (1993). Maryland recognizes two forms of assault: "(1) an attempt to commit a battery or (2) an intentional placing of another in apprehension of receiving an immediate battery." *Dixon v. State,* 302 Md. 447, 457, 488 A.2d 962 (1985) (quoting R. Perkins, *Perkins on Criminal Law* 114 (2nd ed.1969)). *See also Ford v. State,* 330 Md. 682, 699, 625 A.2d 984 (1993) (same). Furthermore, an assault of the attempted battery-type does not require that the victim be aware of the attack. *Harrod v. State,* 65 Md.App. 128, 135,

499 A.2d 959 (1985). "For an assault of the intentional frightening variety, . . . [a]ll that is required in terms of perception is an apparent present ability from the viewpoint of the threatened victim." *Lamb v. State*, 93 Md.App. 422, 443, 613 A.2d 402 (1992).

Appellants were also convicted of obstructing or hindering a police officer. In *Cover v. State*, 297 Md. 398, 413, 466 A.2d 1276 (1983), the Court of Appeals set forth the elements of that offense:

(1) A police officer engaged in the performance of a duty;

(2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;

(3) Knowledge by the accused of facts comprising element (1); and

(4) Intent to obstruct or hinder the officer by the act or omission constituting element (2).

In the present case, although Appellant Graham did not touch any of the officers, he pushed into the crowd that was pushing against the officers, refused to back away from the officers, and yelled at them to let Boyd go. A rational trier of fact could reasonably conclude that Appellant Graham's conduct placed the officers in reasonable apprehension of immediate bodily harm and that Graham so acted with the intent of preventing the lawful apprehension of Boyd.

Regarding Officer Turner's identification of appellants, the jury heard testimony from Sergeant Hardy, Officer Turner, Ms. Chandler, and Ms. Broadus as to the tumultuous situation in the hallway. Although there was some confusion in the hallway, Officer Turner positively identified the appellants as participants with the crowd who prevented the officers from apprehending Boyd and as individuals who had yelled at the officers, pushed and shoved against them, and refused to back away when the officers ordered them to do so. Officer Turner's identification of appellants is sufficient to sustain their convictions. *See Branch v. State*, 305 Md. 177,

184, 502 A.2d 496 (1986) (Testimony of a single eye witness will support a jury conviction); *Walters v. State*, 242 Md. 235, 237–38, 218 A.2d 678 (1966) (citations omitted) ("Identification by the victim is ample evidence to sustain a conviction. The testimony of a victim, unlike that of an accomplice, needs no corroboration.")

Finally, as discussed in Question II., *supra*, appellants did not have to possess actual knowledge that the officers were making a lawful arrest of Boyd at the time they assaulted the officers and interfered with the officers' performance of their duties. Appellants' actions in shoving against the officers and into the crowd, chanting at the officers, refusing to back up when ordered to do so, and pulling Boyd away from the officers was clearly sufficient to demonstrate that appellants acted with the intent to prevent Boyd's lawful apprehension and that they obstructed or hindered the officers in the performance of their duties.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**